# EXHIBIT A

FILED

JUN 1 6 2005

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| Leonard Edward Davis,<br>Mabel Munson Davis,<br>Robert Lee Davis,<br>Versie B. Davis,<br>Kardero James Harris,<br>Versie Lister,<br>Minnie Lee Moore,<br>Sandra Murray,<br>Alfred D. Roberson, Jr.,<br>Mabel Smith,<br>Gloria C. Townsend,<br>Eddie B. Washington,<br><br>   Plaintiffs,<br><br>v.<br><br>Koppers Industries Inc., a foreign corporation; The Burlington Northern Santa Fe Railway Company, a foreign corporation; Monsanto Company, a foreign corporation; The Dow Chemical Company, a foreign corporation, and Vulcan Materials Company, a foreign corporation,<br><br>   Defendants. | § § § § § § § § § § § § § § § § § § § § § § § § |

Civil Action No: A05CA464  SS

Plaintiff Demands Trial by Jury

<u>CLASS ACTION COMPLAINT</u>

PRELIMINARY STATEMENT

 1. The named plaintiffs are residents or former residents of the Somerville,

Burleson County, Texas, area (Somerville).

1

2.  The defendant, Koppers Industries, Inc. (Koppers) owns and operates a wood treatment facility in and near Somerville.  At this facility, Koppers utilizes toxic chemicals to produce treated railroad ties and other chemically treated specialty wood products for the railroad industry.  From time to time Koppers and its predecessors have used a chemical known as pentachlorophenol in addition to coal tar creosote to treat the aforesaid wood products.

3. Koppers and Burlington Northern Santa Fe Railway Corporation (BNSF) and their predecessors are hereinafter referred to from time to time as the "wood treatment defendants".

4.  The remaining defendants are hereinafter referred to from time to time as the "penta defendants".  These defendants manufactured and sold wood treatment products based on a pesticide known as pentachlorophenol.

5.  The named plaintiffs, on behalf of themselves and others similarly situated as is more particularly stated below, here complain that the aforesaid toxic chemicals used to treat these wood products have in the past and currently are escaping from the aforesaid facility. As shown below, these toxic molecules have contaminated plaintiffs' homes and real estate, places of business and public schools in the area.  Further, plaintiffs here complain that the aforesaid toxic chemicals have contaminated the air, ground, and water resources of the Somerville environment.  As a consequence, plaintiffs complain that they have been placed at an unacceptably high risk for serious and life threatening diseases in the future.

6. Plaintiffs, therefore, state the following causes of action against the defendants named above to recover compensation for property damage and for environmental

damage caused by the aforesaid toxic contamination. In connection therewith, plaintiffs also seek to recover the monetary costs of cleaning up the aforesaid contaminated property and environment.

7. In addition to the recovery of monetary damages, plaintiffs further seek through this civil action equitable relief in the form of a court established and supervised fund to pay for medical monitoring of the plaintiffs and those similarly situated. The plaintiffs seek further equitable relief in the form of an injunction to enjoin the further contamination of plaintiffs' homes, properties, persons and businesses and the Somerville environment by the defendants' aforesaid toxic chemicals.

**IDENTIFICATION OF PARTIES**

**PLAINTIFFS**

8. Leonard Edward Davis is a resident of Somerville, Texas, residing at 203 Avenue East, Somerville, Texas 77879. Mr. Davis was born on October 21, 1952, and has lived most of his life in Somerville. He is married to Ola M. Davis and has a daughter, Shanetra M. Davis. Mr. Davis owns real estate in Somerville.

9. Mabel Munson Davis is a resident of Lyons, Burleson County, Texas, residing at 2209 FM RD 60 East, Lyons, Texas, 77863. She was born on December 28, 1934, and has been a resident of the Somerville area since 1984.

10. Robert Lee Davis is married to the plaintiff Mabel Munson Davis and resides with her at 2209 FM RD 60 East, Lyons, Texas, 77863. He was born on August 7, 1934, and has been a resident of the Somerville area since 1984. Mr. and Mrs. Davis own real estate in the Somerville, Texas, area.

11.  Versie B. Davis is a resident of Somerville, Burleson County, Texas, residing at 173 Flemming Road, Somerville, Texas, 77879, since 1945.  She owns the real estate at 173 Flemming Road.

12.  Kardero James Harris is a resident of Somerville, Burleson County, Texas, residing at 305 Avenue East, Somerville, Texas, 77879, where he has lived since his birth on October 27, 1986.

13.  Versie Lister is a resident of Somerville, Burleson, County, Texas.  She has lived on the left side of Highway 36 North since her birth on September 7, 1923.  Her mailing address is P.O. Box 687, Somerville, Texas, 77879.  Mrs. Lister and her husband, William Lister, own their home and real estate.

14.  Minnie Lee Moore is a resident of Somerville, Burleson County, Texas.  Mrs. Moore is married to Charlie Moore and they own their home and real estate in Somerville.  They are long term residents of Somerville.

15.  Sandra Murray is a resident of Houston, Texas, residing at 14410 Alrover Street, Houston, Texas, 77045.  Mrs. Murray was a resident of Somerville from the time of her birth on October 20, 1955, until 1995, when she moved to Houston.

16.  Alfred D. Roberson, Jr. is a resident of Somerville, Burleson, Texas, 77879, and owns the home and real estate located at CR-288-12027 Somerville, Texas, 77879.

17. Mabel Smith is a resident of Portland, Oregon, residing at 6328 North East Rodney Street, Portland, Oregon, 97211.  She was born in the Somerville, Texas, area on March 20, 1931 and lived at 173 Flemming Road, Somerville Texas, from 1931 until 1979.

4

18. Gloria C. Townsend is a resident of Somerville, Burleson County, Texas, residing at 325 Flemming Road, Somerville, Texas, 77879 since 1936. Mrs. Townsend is married to James Townsend and they own the house and real estate located at 325 Flemming Road, Somerville, Texas.

19. Eddie B. Washington is a resident of the Somerville, Burleson County, Texas, area. She has lived at 3205 County Road 289 since 1912 and owns the real estate there located.

20. Each of the named plaintiffs has experienced one or more of the following during the time periods relevant hereto:

   a. Intermittent flooding of their property with surface water running from the contaminated Kopper's railroad tie treatment facility.

   b. Intermittent flooding of their property from Thompson Creek and other natural drains with receive contaminated surface water flowing from the aforesaid rail road tie treatment facility.

   c. Treated wood provided to the plaintiffs by the wood treatment defendants was routinely used as firewood in the homes of the plaintiffs and in some cases used as cooking fuel.

   d. Treated wood ties from time to time would be placed on or near the property of one or more of the plaintiffs for storage prior to their being sold or removed by the wood treatment defendants for some other purpose.

   e. Subsurface water lying under the real estate of the plaintiffs has been and remains contaminated with the chemicals used by the wood treatment defendants as a consequence of the chemicals being spilled and otherwise placed on the soil of the

treatment facility and otherwise placed in leaking containment ponds such that the ground water and the aquifers underlying the Somerville area is now contaminated.

f. One or more of the plaintiffs has in the past experienced "oily tasting" water drawn from fresh water wells in the Somerville area.

g. One or more of the plaintiffs' houses and real estate have become contaminated with dioxins/furans, PAHs and other toxic molecules released from the aforesaid wood treatment facility.

h. The plaintiffs have and continue to experience noxious odors emanating from the aforesaid wood treatment facility.

i. The plaintiffs have and continue to experience poisonous dusts released from the aforesaid wood treatment facility settle from the air onto their respective properties in the Somerville area.

**DEFENDANTS**

**Koppers, Inc.**

21.    The defendant, Koppers Inc. (Koppers) is a Pennsylvania Business Corporation, Entity No. 1049518. Koppers maintains its headquarters at Koppers, Inc., Corporate Headquarters, 436 Seventh Avenue, Pittsburgh, PA 15219-1800. Koppers is an international company and a leading integrated producer of chemicals, carbon compounds, and treated wood products for the aluminum, steel, chemical, plastics, railroad and utility industries. In connection with its Railroad Products and Services business, it has owned and operated a railroad tie treating plant in and near Somerville, Texas, since March 21, 1995. The street address of the plant is Highway 36 North &

County Road 423, Somerville, TX 77879. **Service of process may be had by serving its registered agent for service of process, Corporation Service Company d/b/a CSC - Lawyers Incorporating Service Company, 701 Brazos Street, Suite 1050, Austin, TX 78701, by certified mail, return receipt requested.**

**Burlington Northern and Santa Fe Railway Corporation**

22.    The defendant Burlington Northern and Santa Fe Railway Corporation (BNSF) was incorporated in the State of Delaware on December 16, 1994.    On December 31, 1996, The Atchison, Topeka and Santa Fe Railway Company (ATSF) merged with and into Burlington Northern Railroad Company (BNRR, and BNRR changed its name to The Burlington Northern and Santa Fe Railway Company (BNSF Railway). The rail operations of BNSF Railway, BNSF's principal operating subsidiary, comprise one of the largest railroad systems in North America. From 1905 until 1995, the former Atchison, Topeka and Santa Fe Railway Company (ATSF) operated the Somerville tie treating plant. **Service of process may be had by serving its registered agent for service of process, CT Corporation System, 350 N. St. Paul Street, Dallas, Texas 75201.**

**NEW MONSANTO:**

23.    As shown immediately hereafter, an historical company generally known as Monsanto since the early part of the 20th century began a series of corporate permutations in the mid-1990's. It is therefore necessary to set out in some detail these transactions to fully identify the Monsanto related penta defendants.

24.    The defendant Monsanto Company (hereinafter New Monsanto),    is the successor in interest to the liabilities of Old Monsanto.

25.  Old Monsanto, as more particularly appears below, was a multi-national chemical company manufacturing, among many other chemical products, pesticides including pentachlorophenol which it marketed under its trade name Santophen.  As is shown below, pentachlorophenol, on information and belief, was utilized at the Somerville, Texas, tie treating plant.

26.  Beginning in the mid-1990's Old Monsanto embarked on a plan of restructuring.  At one stage, Old Monsanto changed its name to Pharmacia Corporation.

27.  New Monsanto was incorporated in February 2000 as a subsidiary of Pharmacia Corporation ("Pharmacia"), under the name Monsanto Ag Company.

28.  On March 31, 2000, New Monsanto changed its name from "Monsanto Ag Company" to "Monsanto Company" (referred to herein as New Monsanto).

29.  On September 1, 2000, Pharmacia transferred the assets and liabilities of its agricultural business, which included the pentachlorophenol product Santophen, along to New Monsanto pursuant to the terms of a Separation Agreement.

30.  On October 23, 2000, New Monsanto sold 38,033,000 shares of its common stock in an initial public offering at a price of $20 per share.  Pharmacia continued to own the remaining shares, representing 85.2% of the outstanding shares.

31.  On August 13, 2002, Pharmacia spun off its remaining interest in New Monsanto by distributing its entire ownership of New Monsanto stock to Pharmacia shareholders by means of a tax-free dividend. The stated reasons for the separation of the agricultural business from the other businesses of Pharmacia were that as a separate company, the agricultural business could have a more focused investor base, greater strategic focus and the ability to offer better incentives to employees.

8

32.  Under the terms of the Separation Agreement, New Monsanto agreed to indemnify Pharmacia for any liability it might have for environmental remediation or other environmental responsibilities primarily related to Pharmacia's former agricultural or chemical businesses.

33.  New Monsanto emerged from the tangle of business deals instigated by Old Monsanto, with not only Old Monsanto's valuable agricultural assets intact but also Old Monsanto's legacy liability for its pesticide product Santophen.

34.  New Monsanto maintains its principal offices in St. Louis, MO, the same corporate park occupied for decades by the Old Monsanto.  New Monsanto rarely refers to its former self by the name "Monsanto", choosing instead to refer to legacy issues in the name of the defendant Pharmacia, a company that did not exist prior to March 31, 2000.

35.  The defendant Pharmacia Corporation ("Pharmacia") was originally incorporated under the name Monsanto Company (the successor to a Missouri corporation, Monsanto Chemical Works).

36.  On March 31, 2000, MP Sub, Incorporated, a wholly-owned subsidiary of Pharmacia (then named Monsanto Company), merged with and into Pharmacia & Upjohn, Inc. ("P&U") pursuant to the terms of an Agreement and Plan of Merger dated as of December 19, 1999, among the parties (the "Merger Agreement").

36.  As a result of the merger, each share of common of common stock of P&U was converted into 1.19 shares of the common stock of Pharmacia, and each share of Series A Convertible Perpetual Preferred Stock of P&U was converted into one share of a

9

new series of convertible preferred stock of Pharmacia designated as Series B Convertible Preferred Stock.

37.  As a part of the aforesaid merger, Old Monsanto was renamed Pharmacia Corporation and P&U became a subsidiary of Pharmacia.

38.  After the merger, the agricultural operations of Pharmacia were transferred to New Monsanto.

39.  On July 13, 2002, Pfizer Inc. ("Pfizer") entered into an Agreement and Plan of Merger (the "Merger Agreement") with Pharmacia and Pilsner Acquisition Sub Corp., a direct wholly-owned subsidiary of Pfizer (the "Merger Sub").

40.  The aforesaid merger was completed on July 16, 2003, at which time the Merger Sub was merged with and into Pharmacia, and Pharmacia survived the merger as a wholly-owned subsidiary of Pfizer.

41.  Each Pharmacia shareholder received 1.4 shares of Pfizer stock for each share of Pharmacia stock, and each share of Pharmacia's Series C convertible perpetual preferred stock was exchanged for one share of Pfizer Series A convertible perpetual preferred stock.

42.  The total estimated purchase price paid by Pfizer was $56 billion.

43.  A condition precedent to Pfizer paying the purchase price was that Pharmacia had to cause one of the following to occur:  (i) a spin-off of New Monsanto, (ii) the sale of all or substantially all of the assets of New Monsanto followed by the liquidation and dissolution of New Monsanto, or (iii) the sale of all of Pharmacia's equity interest in Monsanto.

44.  Pharmacia is a Delaware corporation with principal offices in St. Louis, MO.

10

45. At all relevant times, Pharmacia was and is a successor to the liabilities of Old Monsanto.

Service of process may be had by serving Monsanto's registered agent for service of process, Corporation Service Company d/b/a CSC - Lawyers Incorporating Service Company, 701 Brazos Street, Suite 1050, Austin, TX 78701, by certified mail, return receipt requested.

Dow Chemical Company

46. The defendant The Dow Chemical Company is a business incorporated under the laws of the State of Delaware. During relevant time periods herein, Dow manufactured, formulated and sold a pentachlorophenol product known by various trade names including Dowicide. On information and belief this product was utilized in the treatment of ties and other wood products at the Somerville, Texas, wood treatment facility. Service of process may be had by serving its registered agent for service of process, CT Corporation System, 350 N. St. Paul Street, Dallas, TX 75201, by certified mail return receipt requested.

Vulcan Materials Company

47. The defendant Vulcan Materials Company (Vulcan) is a business incorporated under the laws of the State of New Jersey. Vulcan's Chemicals Division was formed in 1957 and manufactured, formulated and sold pentachlorophenol to the wood treatment industry, ultimately becoming the sole US supplier of this product. In October, 2004, the defendant Vulcan sold its Chemicals subsidiary to Basic Chemical Company, LLC, a subsidiary of Occidental Petroleum Corporation, a Delaware corporation. Service of process may be had by serving its registered agent for service

of process, **Prentice Hall Corporation System, 701 Brazos Street, Suite 1050, Austin, TX 78701, by certified mail, return receipt requested.**

**JURISDICTION**

48. This court has jurisdiction of the within civil action pursuant to 28 U.S.C. section 1332 as amended by the Class Action Fairness Act of 2005 and other pertinent provisions thereof.

49. The matters in controversy between the plaintiffs and defendants greatly exceed $5,000,000.

**SPECIFIC RULE 23 CLASS ACTION ALLEGATIONS**

50. As is shown below, the plaintiffs seek to have themselves recognized as class representatives in order to prosecute the within civil action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and other pertinent provisions thereof.

**A. Rule 23(a) Allegations.**

　　　　**1. Numerosity.**

51. The putative class, as alleged above in paragraph __, numbering in excess of 2500 current and former residents and property owners of the class affected area, is so numerous that joinder of all members is impracticable.

　　　　**2. Commonality.**

52. Rule 23(a)(2) of the Federal Rules of Civil procedure provides that "commonality" is satisfied upon a showing that there are questions of law or fact

12

common to the class. *In Re Rezulin Litigation v. Hutchinson, 214 W.Va. 52, 585 S.E2d 52 (2003).*

53. The claims of the putative class as well as the class representatives, as shown above, all arise from the same set of conditions created by the wood treatment defendants from 1905 to the present at the Somerville plant site located near Somerville, Burleson County, TX. The mechanism of exposure and contamination is common to all persons in the class affected area.

54. Each member of the putative class was, and is being, exposed to the same toxins. As a consequence of the juxtaposition of the putative class members to the contamination caused by the defendants, each of the class members is now at an increased risk of developing one or more of a discernable set of diseases epidemiologically, clinically, and observationally linked to the contaminants generated by the defendants' at the Somerville plaint.

55. The wood treatment defendants were under a legal duty to use their Somerville property in such a way as to not unreasonably interfere with the rights of the plaintiffs and the putative class members to enjoy their property. Beginning in 1905 the defendants breached this duty to the plaintiffs and caused abnormally dangerous substances to escape the wood treatment defendants' Somerville property. As more particularly plead below, the class members and their property were all injured and damaged as a consequence of the same breach of duty the defendants owed to each class member as a matter of law.

56. The penta defendants were under a duty not to put defective products in the market place. The putative class members were all adversely affected the same way and were all owed the same duty by the penta defendants.

### 3. Typicality.

57. As shown above, plaintiffs here allege questions of law or fact common to the class and the claims of the representative parties. Further, the claims of the plaintiffs are typical of the claims of the putative class. Contamination of the real estate owned by the putative class members was all contaminated in the same way, during the same time period, and presents the same type of property damage as to each potential class member. Further, the risk of serious harm, injury, and disease to each of the class members was created in the same way, by the same defendants during the same time period and the risk is typical of each class member. Further, the same type of toxic molecules threatens each of the putative class members and subjects each to the enhanced risk of the same injuries and disease processes.

58. A representative party's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory. These claims are not required to be identical. *In Re Resulin Litigation v. Hutchison, supra, at Sylb. Pt. 12*

### 4. Adequacy of representation.

59. The representative parties and their properties are, and in the past have been located, within the plume of contamination emanating from the aforesaid wood treatment plant site, and therefore share the same risk as the putative class members. The representative plaintiffs must necessarily protect the interests of the class as they seek to protect themselves;

14

the plaintiffs, because of their shared interests with the putative class, are adequate to represent the interests of the class and any sub-classes.

60.    The law firms seeking to represent the putative class possess the financial resources and possess the requisite experience to vigorously represent the class and any subclass in this litigation.

**B. Rule 23(b)(1)(A) Allegations.**

61.    The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the defendants opposing the class.

62.    As shown above, the sheer number of putative class members, should their claims be litigated separately, will with certainty result, over time, in inconsistent judgments.

63.    Inasmuch as this lawsuit addresses over 100 years of misconduct by the defendants, it is important that the litigation result in clear standards of conduct for other corporations who are or would seek to conduct business within the jurisdiction of Burleson County, TX.

**C. Rule 23 (b)(2) Allegations.**

64.    The representative plaintiffs, on behalf of the putative class members, seek equitable relief from the defendants in order to stop future contamination of plaintiffs' property with coal tar creosote, PAHs, dioxins, furans and other toxins migrating from the defendants' Somerville plant site.  The injunctive relief sought is permanent and final in nature as more fully appears below.

15

65.    As clearly set forth above, the defendants have engaged in a course of conduct since 1905 which essentially guarantees continued contamination of plaintiffs' property, as well as the property of the putative class members with dioxin and other related toxins due to wind erosion and surface water run-off from the Somerville plant site.

66.    Further, plaintiffs are seeking to establish a medical monitoring class.  The plaintiffs seek to recover the costs of medical monitoring necessary to determine whether the plaintiffs have sustained or will develop in the future, any injuries from their exposure to the aforesaid toxins.  These costs are sought on behalf of the representative plaintiffs as well as the putative class members.

67.    Under Rule 23(b)(2) of the Federal Rules of Civil Procedure , after liability has been established, the court may exercise its equitable powers to establish and administer a court-supervised medical monitoring program to oversee and direct medical surveillance, and provide for medical examinations and testing of members of a class.

68.    As more particularly appears below, the plaintiffs seek on behalf of themselves and others a court supervised fund for purposes of medical monitoring.

**D.  Rule 23(b)(3) Allegations.**

69.    While none but a theoretical "class action" is populated with members of clone-like similarity, the instant case, because of the sheer numbers of putative class members experiencing the same contamination and because the same defendants are responsible for the contamination of the affected communities, issues of fact and law common to the class members predominate over the individual issues attendant to each class member.  No individual class member, given the complexity and expense of proving the necessary elements of this civil action, can express a credible argument in favor of individual prosecution over the

device of Rule 23. Currently, there is no litigation pending regarding the deposition of wind and water borne contaminated dust and sediment on the buildings, property and person of the residents of the Somerville toxic ellipse. Because the same defendants acting jointly, severely and in concert during the operative time period are responsible for the environmental mess and human health tragedy that now is the profile of the affected communities, justice requires that the litigation be concentrated in this civil action to allow for the marshalling of money and manpower necessary to effectively litigate the case on behalf of the affected population. By concentrating the many common issues of scientific and technical proof, the common issues of fact regarding the defendants' conduct in causing substantial portions of the aforesaid communities to be contaminated, and the many common issues of fact regarding the toxicity of the molecules in question, in a single Rule 23 action, the court will be afforded an efficient and cost effective strategy to manage the numerous class members being represented in this civil action.

70. Given today's style of corporate defense, the court can expect a tiresome and obstructionist litigation strategy by the defendants, underscored by collateral attacks on the reputations of the experts employed by the plaintiffs, stonewalling discovery tactics and a strategy of using the rules to effect delay all for the ulterior purpose of breaking the financial back of any individual plaintiff with the temerity to pursue a civil action such as this. Such a defense strategy is premised on the tactic of winning the litigation by attrition rather than defending on the merits of plaintiffs' claims. In the face of a well financed corporate litigation team employing such tactics, litigation of individual claims would become a practical impossibility. Rule 23 provides the only effective and efficient tool for the court to provide a fair forum for the litigation of plaintiffs' claims.

17

71. The defendants, over the course of approximately 100 years, indiscriminately contaminated the plaintiffs' and putative class members' property, making no allowances for individual differences among the class members in this toxic undertaking. The defendants injured and contaminated the plaintiffs and their property as a group. In this conduct, the defendants' only criteria were that the individual putative class member be located under the aforesaid plume of toxins. Defendants' misconduct was broad, and it was carried out in a manner heedless of any peculiarities of the individual residents of the affected areas. Plaintiffs now, having been injured as a group, should be permitted, in consideration of simple justice and fair play, to, as a group, through class representatives, prosecute the defendants in this single Rule 23 action. The Plaintiffs, therefore, bring this case on behalf of themselves and others similarly situated.

**E.  Class Definition.**

72. The class is made up of all persons who have had their person and/or property contaminated with the aforesaid toxins released from the Somerville plant..

73. The putative class of all such persons is divided into three natural sub-classes: (1) The Property Owners Class which is made up of current real property owners, including leasehold interests, whose property is contaminated with the aforesaid toxins; and, (2) The Medical Monitoring Class, which is divided into three sub-classes: (a) all persons presently residing or who in the past resided in the area of contamination (hereinafter Class Affected Area) for at least one year during the period 1905 to the present and (b) all persons employed in the Somerville area for at least 1 year during the period 1905 to the present; and (c) all persons who currently are or who have in the past attended public schools in the Class Affected Area during the period 1950 to the present.

74.  The Class Affected Area is the area within a range of a five mile radius from the location of the Somerville plant.

75.  Excluded from this class are: (1) the defendants and their respective officers, directors, and managerial employees, if any; (2) all attorneys and their staffs involved in this litigation; (3) the presiding judicial officer and the presiding judicial officer's staff.

**Wherefore,** plaintiffs, after a reasonable but expedited class discovery period, pray that this Court certify a class as above plead, name plaintiffs' counsel herein as class counsel, and proceed to the merits of this important civil action on the basis of Rule 23 of the Federal Rules of Civil Procedure.

## GENERAL FACTUAL ALLEGATIONS

76.  The Somerville facility occupies a 200-acre tract of land approximately one mile northwest of the intersection of Highway 36 and FM 1361 on the northeastern edge of the city of Somerville in Burleson County, Texas.

77.  The Somerville plant was constructed by Ayer and Lord in 1897 and treated railroad ties by contract for AT &SF under the name of Texas Tie and Lumber Preserving Company (TT & LPC).

78.  In January 1905, the plant was purchased by AT & SF.  TT & LPC operated the original Somerville plant until 1905.  It was then dismantled in favor of a new facility built nearby, which is the present site of the plant as aforesaid.

79. The new plant began production in February 1906, and on December 2, 1912, the plant's name was changed to Santa Fe Tie and Lumber Preserving Company. On June 2, 1950, this subsidiary was absorbed by the Santa Fe Railway (AT & SF).

80. On March 28, 1995, AT & SF sold the Somerville plant to the defendant Koppers. As shown above, AT & SF merged with and into the defendant BNSF on December 31, 1996.

81. BNSF has represented to the Texas Natural Resource Conservation Commission that it assumes responsibility for the historic contamination of the Somerville site.

82. From its inception in the late 1800's and continuing today, the plant has and does today manufacture railroad cross ties, bridge timbers, poles, piling, and other wood products all of which are treated on site with one or more pesticides and wood preservatives including derivatives of coal tar creosote and chlorinated pesticide compounds including pentachlorophenol.

83. The manufacturing process consists of vapor drying the various shaped wood pieces followed by pressure treating the wood with creosote/oil mixtures as well as certain pesticidal extenders and chlorinated pesticides including the aforesaid pentachlorophenol. The resulting treated wood products are used in the railroad industry.

84. Coal tars are by-products of the carbonization of coal to produce coke and/or natural gas. Coal tars are complex combinations of polycyclic aromatic hydrocarbons, phenols, heterocyclic oxygen, sulfur, and nitrogen compounds. Coal tar creosotes are distillation products of coal tar.

85.  Coal tar creosotes consist of aromatic hydrocarbons, anthracene, naphthalene, and phenanthrene derivatives.  At least 75 per cent of coal tar creosote mixture is made up of polycyclic aromatic hydrocarbons (PAHs).

86.  The composition of the creosote mixture is dependent on the sources and preparation parameters of the coal tar, and as a result the creosote components are rarely consistent in their type and concentration.  An example of the composition variability among creosote samples was recently presented by Weyand et al. (1991). In that study , the concentrations of several PAHs were analyzed in four coal tars.  All of the PAHs identified exhibited 2-fold to nearly 20-fold differences in concentration among the four samples.

87.  The coal tar creosote mixtures at issue here represent 100 years of different formulations used at the Somerville site.  These formulations contained from time to time 199 identifiable PAHs including benzo(a)pyrenes and dibenzofurans.  Coal tar creosote (creosote) is a soup of hundreds, if not thousands, of compounds most of which are toxic to the environment and man.

88.  To this creosote soup, oil and other extenders, including but not limited to, pentachlorophenol are added to create the "creosote" utilized in the pressure treatment of wood at facilities like Somerville.

89.  The aforementioned compound, pentachlorophenol, is a chlorinated compound used as a pesticide in the treatment of specialty wood products such as poles and railroad ties and other applications where wood comes into contact with soil making it vulnerable to insect attack.  Often pentachlorophenol, in the past, was used in the creosote treatment of specialty products.  On information and belief pentachlorophenolic

21

compounds were used in the treatment of specialty wood products at the Somerville site at relevant times.

90.  During the manufacturing process of pentachlorophenol dioxins are formed as an unwanted by-product of production.  Further, given the chemical make-up of pentachlorophenol, it is a likely generator of dioxins and furans when subjected to heat and pressure of the sort utilized in the pressure treatment of specialty wood products at the Somerville facility.

91.  Because of the availability of benzene in coal tar creosote, a source of chlorine in an environment of heat and pressure together with oxygen presents the opportunity for a variety of dioxins and furans to form during the tie treating process.

92.  Creosote and its constituent compounds, pentachlorophenol, dioxins and furans are toxic and harmful to man and the environment.

93.  During the operative time period from 1905 to the present, BNSF and Koppers operated a pressure treating facility at Somerville which encompassed the use of large metal cylinders into which shaped wood products would be placed.  Under pressure and heat creosote and other pesticides would infuse the wood and displace water thus impregnating the railroad ties and other products with the aforesaid pesticides.

94.  Currently, the Somerville plant utilizes four 8 feet in diameter, 155 feet long cylinders into which specialty wood is placed for pressure treatment.

95.  Because of the magnitude of the treatment operation at Somerville, enormous quantities of creosote and other pesticides have in the past and currently are being utilized on a daily basis.

96. Due to the size of the operation, extensive stacks of treated railroad ties and other treated products are, and at all relevant times in the past have been, placed on the ground for purposes of "curing out". Volatilized molecules of the aforesaid toxic compounds off gas from this process and are carried by the prevailing winds over the Somerville area. Creosote and other pesticides drip from the curing treated wood products and leech into the soil causing contamination of the soil, surface water and sub-surface water including the aquifers underlying the Somerville area.

97. Independent testing has verified the presence of toxic compounds including dioxins/furans and PAHs inside the homes of Somerville residents. Likewise, independent testing has verified the presence of toxic compounds including dioxins/furans and PAHs in the residential soil of the Somerville area. The nature and make-up of the aforesaid compounds establish that the Somerville site is the generator of these compounds.

98. Governmental mandated testing of soil, sediment, surface and sub-surface water on the Somerville site has verified the presence of the afore- said toxic and dangerous compounds.

99. The Texas Natural Resource Conservation Commission (TNRCC) has documented the contamination of the aquifer underlying the Somerville area.

100. The TNRCC has documented soil contamination at the Somerville site.

101. Surface water run-off from the Somerville site has carried contaminated sediment to the waters of Thompson Creek and other natural drainage features resulting in off site contamination of the Somerville area.

102. As a consequence of the foregoing, but not limited to the foregoing, activities of the wood treatment defendants toxic substances including PAHs, dioxins/furans, arsenic and other dangerous and deadly toxins were at all relevant times generated and released from the aforesaid Somerville site.

## FIRST CAUSE OF ACTION

### PRIVATE NUISANCE – WOOD TREATMENT DEFENDANTS

103. Plaintiffs incorporate by reference all foregoing paragraphs in this First Cause of Action the same as though each was fully set forth verbatim herein in the first instance.

104. The acts and omissions complained of above and elsewhere in this complaint caused contamination of groundwater below plaintiffs' property, the soil on and adjacent to plaintiffs' property and the air on plaintiffs' property and further caused the insides of plaintiffs' homes to be contaminated with the afore described toxins and as such these acts and omissions constitute a private nuisance.

105. The contamination described in the preceding paragraph was and is harmful to the health of the plaintiff property owners, was and is offensive to their senses and has and will in the future obstruct the free and unrestricted use and enjoyment of their property.

## A. INTENTIONAL NUISANCE – STRICT LIABILITY.

106. Plaintiffs incorporate by reference paragraphs 1 through __ the same as though each were fully set forth herein verbatim in the first instance.

24

107.  Since 1905, the wood treatment defendants by virtue of the actions of BNSF and its predecessors and successors,  and the other defendants by virtue of their actions, jointly, severally, created and maintained a nuisance on the property known as the "Somerville plant", to-wit:  the defendants through their manufacturing processes caused to be created the aforesaid PAHs, dioxins/furans, arsenic and other toxins in connection with the treatment of railroad ties and other specialty treated wood products for the railroad industry.

108. The aforesaid toxins escaped from the defendants' property to the lands and property of the representative Propertied Plaintiffs and to the lands of the putative class of Propertied Plaintiffs.  Propertied Plaintiffs allege that the defendants intended to cause the formation of these toxins and, further, Propertied Plaintiffs allege that the defendants intended the toxins to escape to the lands of the representative Propertied Plaintiffs and to the lands of the putative class of Propertied Plaintiffs.

109.  Because the defendants knew or should have known that their conduct in producing the aforesaid toxins and causing them to escape the Somerville Plant site was causing a substantial and unreasonable interference with the Propertied Plaintiffs' interests in the use and safe enjoyment of their respective real estate, the defendants' conduct in so doing was and is intentional and unreasonable and as such, constitutes an intentional and actionable nuisance.

110.  Because the gravity of the harm to the Propertied Plaintiffs and the putative class members presented by the aforesaid toxins outweighs the social value of the defendants' activity in their past production of treated wood ties and the consequent

generation of the aforesaid toxins and in their present maintaining of a plant site the defendants' contamination of plaintiffs' property and the water under their property and the air over their property with the aforesaid toxins is unreasonable.

111.    Because the defendants' conduct in interfering with plaintiffs' property interests was and is intentional and unreasonable, the defendants and each of them are strictly liable to the Propertied Plaintiffs and to the putative class members they represent, for the harm and damages proximately caused thereby.

112.    As a direct and proximate cause of the defendants' invasion of the plaintiffs' property with the aforesaid toxins the plaintiffs' interest in their respective real estate has been injured in the following but not limited to the following ways:

113.    The Propertied Plaintiffs and the members of the putative class of propertied persons they represent have suffered diminution in property value due to the aforesaid contamination; and,

114.    Have incurred and will incur cleanup costs associated with the decontamination of their respective properties.

115.    The plaintiffs and the members of the putative class as a consequence of the contamination of their property are at a substantially increased risk over that of the general population for the development of a number of serious adverse health conditions which is more particularly set forth below.

**WHEREFORE,** the Propertied Plaintiffs on behalf of themselves and others similarly situated, demand judgment of and from the defendants and each of them in an

26

amount and manner hereinafter prayed for to compensate them for all losses of property value and for all expenses and for the intrinsic value of losing their houses which are also homes.

**B. Unintentional and Otherwise Actionable Nuisance.**

116.  Plaintiffs incorporate all allegations and preceding paragraphs the same as though fully set forth herein in the first instance.

117.  **IN THE ALTERNATIVE**, the wood treatment defendants' conduct in producing the aforesaid toxins and causing them to contaminate the property of the Propertied Plaintiffs and the property of the members of the putative class was **unintentional** and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

118.  Defendants conduct in invading the property interests of the Propertied Plaintiffs with the aforesaid toxins was negligent and reckless and as such constituted an actionable nuisance, subjecting defendants to liability for any harm proximately caused by defendants' unlawful invasion of plaintiffs' property and the property of the putative class members the Propertied Plaintiffs represent.

119.  Additionally, and in the alternative to plaintiffs' allegations that defendants' were negligent and reckless, plaintiffs allege the aforesaid toxins are an abnormally dangerous instrumentality and the production of and release of the aforesaid toxins is an

27

abnormally dangerous activity within the meaning of *Rylands v. Fletcher L.R. 3 H.L. 330 (1868).[1]*

120.  Plaintiffs further allege that the aforesaid contamination of the Somerville plant site is an abnormally dangerous condition.

121.  The defendants for their own purposes and economic profit chose to create, handle and maintain the aforesaid toxins on their Somerville plant site premises.  In so doing, the defendants released into the air "poisonous dust" fumes and particulates and caused surface water and subsurface water to become contaminated which, as a matter of law, constitutes an abnormally dangerous activity.

122.  Because the defendants created an abnormally dangerous condition and because the defendants engaged in an abnormally dangerous activity, the defendants are strictly liable to the Propertied Plaintiffs for any harm and injury proximately caused by the abnormally dangerous toxins.

123.  As a direct and proximate consequence of the defendants and each of them maintaining and creating an abnormally dangerous condition and instrumentality on the aforesaid plant site, the Propertied Plaintiffs and the members of the putative class they represent have been injured and damaged, suffering loss of property and the plaintiffs

---

[1] Elements of abnormally dangerous instrumentality or condition:
    a. existence of high degree of risk of some harm to the person, land, or chattels of another;
    b. likelihood that the harm that results will be great;
    c. inability to eliminate the risk by exercise of reasonable care;
    d. extent to which activity is not a matter of common usage;
    e. inappropriateness of the activity to the place where it is carried out;
    f. extent to which its value to the community is outweighed by its dangerous attributes.

have further been subjected to a great increase in the risk of developing serious diseases as more fully appears in plaintiffs' medical monitoring claims in Count _ below.

**WHEREFORE,** plaintiffs demand judgment against the defendants and each of them for the injury and damages hereinafter set forth caused by the defendants' aforesaid abnormally dangerous activities in an amount and manner more particularly set forth below.

## C. EQUITABLE RELIEF FOR ACTIONABLE NUISANCE

Plaintiffs incorporate all preceding paragraphs and allegations.

124. Koppers, at the present time, is engaged in the continued operation of the Somerville plant and continues to generate and release the aforesaid toxins in the aforesaid manner. This activity is causing the continued escape of toxins from the site to the Somerville community further enhancing the risk of harm to the citizens of Somerville.

125. The risk of harm is irreparable and plaintiffs have no adequate remedy at law in the face of defendants' willful contamination of Somerville and the surrounding area.

126. Because toxins continue to escape from the Somerville plant site, plaintiffs seek equitable relief in the form of an injunction to enjoin any further release of toxins from the premises.

**Wherefore,** plaintiffs pray for the issuance of a permanent injunction, enjoining the defendants from further activity at the Nitro plant site until and unless the dioxin contamination is first abated.

## ACTIONABLE TRESPASS

127.  At common law, any act which directly brought foreign matter, whether a human being, an animate or inanimate chattel, or a structure, upon land in the possession of another was redressible in an action of trespass quare clausum fregit.  The direct causal relation between the conduct of the actor and the intrusion of the foreign matter upon the possessor's land was sufficient to create a trespass.

128.  One who recklessly or negligently, or as a result of an abnormally dangerous activity, enters land in the possession of another or causes a thing or third person so to enter is subject to liability to the possessor if, but only if, his presence or the presence of the thing or the third person upon the land causes harm to the land, to the possessor, or to a thing or a third person in whose security the possessor has a legally protected interest. *Restatement (Second) of Torts section 165 (1965).*

129.  In furtherance of their business interests, the wood treatment defendants, caused the aforesaid toxins to be produced and released during the conduct of their business at the Somerville plant.

130.  The defendants at relevant times recklessly or negligently, or as a result of the abnormally dangerous activity of producing and releasing toxins at the Somerville

30

plant site, caused the property of the Propertied Plaintiffs to be invaded by aforesaid the aforesaid toxins, causing great and substantial harms to persons, land and chattels of the Propertied Plaintiffs and the members of the putative class they represent.

131.  As a direct and proximate result of the defendants' trespass, as aforesaid, the plaintiffs and the members of the putative class have been harmed and injured as aforesaid in their person and property.

**WHEREFORE** the plaintiffs pray for damages in an amount hereinafter set forth and further, plaintiffs pray for equitable relief from the continued migration of toxins from the Somerville plant site to the lands and properties of the plaintiffs all as aforesaid.

### *RYLANDS V. FLETCHER* – STRICT LIABILITY

132.  Plaintiffs incorporate by reference each and every allegation and paragraph in the foregoing and adopt them as though fully set forth herein in the first instance.

133.  Although the Propertied Plaintiffs' *Rylands* style strict liability claims may be subsumed within the nuisance allegations, all representative plaintiffs allege on behalf of all classes of putative class members that irrespective of nuisance, the defendants' operations at the Somerville site were and are abnormally dangerous within the meaning of the *Restatement (Second) of Torts 519 and 520 (1976)*[2] definition of "abnormally dangerous".

---

[2] 519. GENERAL PRINCIPLE
   (1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

134.    The aforesaid toxins and particularly dioxins/furans and PAHs are abnormally dangerous.

135.    The production and release of the aforesaid toxins and particularly dioxins/furans and PAHs is an abnormally dangerous activity.

136.    Maintaining property contaminated with the aforesaid toxins and particularly dioxins/furans is an abnormally dangerous activity.

137.    The defendants in choosing to use, produce, maintain and otherwise create the aforesaid toxins at the Somerville plant site chose to create abnormally dangerous instrumentalities (the toxins) and are strictly liable without a showing of negligence for any injury proximately caused the plaintiffs and the members of the putative class by the aforesaid instrumentalities.

138.    As a direct and proximate result of the defendants activities as aforesaid, but not limited thereto, poisonous and toxic dust, fumes, and water have invaded the property and person of the plaintiffs and each of them and plaintiffs have, therefore been damaged and injured in their person and property as set forth above and more particularly stated below.

---

(2) this strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.
520. ABNORMALLY DANGEROUS ACTIVITIES
In determining whether an activity is abnormally dangerous, the following factors are to be considered:
(a) existence of a high degree of risk of some harm to the person, land or chattels of others;
(b) likelihood that the harm that results from it will be great;
(c) inability to eliminate the risk by the exercise of reasonable care;
(d) extent to which the activity is not a matter of common usage;
(e) inappropriateness of the activity to the place where it is carried on; and
(f) extent to which its value to the community is outweighed by its dangerous attributes.

**Wherefore** the plaintiffs demand judgment of and from the defendants and each of them in an amount hereinafter prayed for.

## COUNT TWO

## DEFECTIVE PRODUCT CLAIMS

## ULTRA-HAZARDOUS PRODUCT CLAIM

139. Pentachlorophenol (penta or PCP) was first introduced for use as a wood preservative in 1936 by Dow Chemical Company and Monsanto Chemical Company (Old Monsanto).

140. Historically, there were two manufacturing processes used to produce penta: (1) the direct chlorination of phenol, the Boehringer process; and (2) the alkaline hydrolysis of hexachlorobenzene, the Dow process.

141. On information and belief, the Monsanto defendants produced PCP at the Sauget, Illinois plant until 1978.

142. On information and belief Dow produced PCP at its Midland, Michigan plant until 1980. Its capacity in 1980 is believed to have been 13,500 tons.

143. On information and belief, there were other producers of PCP during the relevant time periods whose products may be shown upon discovery to have been used at the Somerville site.

144. PCP is an aromatic hydrocarbon of the chlorophenol family. Chlorophenols are phenols carrying one or more atoms of chlorine. PCP is used as a fungicide,

33

insecticide, mollusicide, algaecide, disinfectant, and as an anti-fouling paint ingredient. Its primary use in the United States is, and at all relevant times herein, as an industrial and commercial wood preservative for utility poles, fence posts, and railroad ties.

145.   The manufacturing process of PCP does not produce a perfect penta molecule because the reactions are not carried out to their theoretical conclusion. Technical grade penta contains from 4 to 12 percent tetrachlorophenols which are in and of themselves toxic to the environment and man.

146.   Other contaminants include polychlorodibenzodioxins (PCDDs including 2,3,7,8 tetrachlorodibenzo-p-dioxin or 2,3,7,8 TCDD), polychlorodibenzofurans (PCDFs), polychlorodiphenyl ethers, polychlorophenoxyphenols, chlorinated cyclohexenons and cyclohexadienons, hexachlorobenzene, and polychlorinated biphenyls (PCBs).  These contaminants are toxic to the environment and man.

147.   The aforesaid contaminants are created by man, generally do not appear in nature and are intrinsically toxic and poisonous to man and the environment and by virtue thereof are abnormally dangerous.  Further, because the aforesaid contaminants do not normally appear in the environment and do not normally appear in the places where the stream of commerce takes them, they present abnormal dangers to persons encountering them in the environment, and they present abnormal dangers to persons encountering them in those places where the stream of commerce has caused them to be.

148.   The manufacture and use of PCP based products is an abnormal activity not engaged in by persons in general.  In particular, the plaintiffs and the members of the

34

putative class do not and have not engaged in such activity in the community of Somerville, Texas.

149.    The aforesaid PCPs and the associated toxins all as aforesaid are not normally found in Somerville, Texas. Their presence there is abnormal, the aforesaid toxins having been sent there by the defendants.

150.    The abnormal risks to persons exposed to the aforesaid toxins and contaminants include, but are not limited to, increases in the incidence and prevalence of cancers of the spleen, liver, acute leukemia, soft-tissue sarcoma, and other blood borne cancers. Because of the molecular shapes and make-ups of the afore said contaminants oxidative damage to mitochondria and resultant cell apoptosis and other mechanisms increase the risk of damage to the central, peripheral and autonomic nervous systems.

151.    Because of the abnormal dangers to human health, as aforesaid, but not limited thereto, posed by the aforesaid PCPs and their toxic contaminants, these products are ultra-hazardous and therefore defective.

152.    The PCP defendants engaged in the manufacture, distribution and sale of products containing pentachlorophenol which bore various trade names depending on the manufacturer. For example, the Monsanto defendants' line included Santophen. Dow's line included Dowicide . The Vulcan defendants' products included GLAZD, Penta, and Block Penta.

153. As shown above, the defendants' PCP based products were placed in the stream of commerce in a defective and abnormally dangerous and thus ultra-hazardous condition.

154. The representative plaintiffs and the members of the putative class were at all relevant times reasonably foreseeable persons who were likely to encounter or otherwise have their person and/or property exposed to the aforesaid contaminants and toxins.

155. At all times relevant and upon information and belief, the PCP defendants produced, placed in the stream of commerce, and/or sold contaminated PCP products which the PCP defendants knew or should have known would reach wood treatment facilities which were located in or near communities such as Somerville, Texas, and the defendants in fact knew or should have known that from time to time their products, as aforesaid, reached the Somerville, Texas, facility.

156. The plaintiffs and the members of the putative class were exposed to the aforesaid toxins as more particularly set forth above.

157. As a direct and proximate result of the plaintiffs personal and property exposures to the aforesaid ultra-hazardous products the plaintiffs and the putative class members have been injured and suffered the loss of property value, incurred future environmental and property clean-up and remediation costs and will in the future be required to expend monies in and about the monitoring of their health.

36

158.    Wherefore, plaintiffs on behalf of themselves and the putative class members demand judgment of and from the defendants, jointly, severely, and individually an amount and in a manner hereinafter prayed for.

## MANUFACTURING DEFECT CLAIM

159.    The foregoing paragraphs and allegations are incorporated by reference in connection with plaintiffs' manufacturing defect claim.

160.    The PCP defendants set out, as a foresaid, to manufacture or otherwise produce products based on the pentachlorophenol molecule.

161.    The PCP defendants' products and each of them contained manufacturing defects in the form of the aforesaid unwanted by-products and contaminants all as aforesaid.

162.    The PCP defendants never manufactured a single PCP product that was not defective by reason of the incomplete, uncontrolled, manufacturing process that allowed for the production of "dirty" PCP that had associated with it the aforesaid toxic and harmful contaminants.

163.    As aforesaid, the PCP defendants knew or should have known that their defective products would reach the Somerville, Texas, plant and further that these products would generate and release the toxins as aforesaid thus exposing the plaintiffs and the members of the putative class.

37

164. As a direct proximate result of the defendants placing the aforesaid defective products in the stream of commerce the plaintiffs and the members of the putative class have been and currently are being injured in their person and property, all as aforesaid.

165. Wherefore, plaintiffs on behalf of themselves and the putative class members demand judgment of and from the defendants, jointly, severely, and individually an amount and in a manner hereinafter prayed for.

## COUNT III

## NEGLIGENCE

166. Plaintiffs repeat, reassert and real ledge all previous allegations set forth herein.

167. Defendants owe plaintiffs and class members a duty of reasonable care in operating the Somerville railroad tie treatment facility.

168. Defendants knew or should have known that the Somerville facility released hazardous wood treatment waste and toxins, as aforesaid, into the area where the plaintiffs and class members lived, owned property and worked. Defendants also knew or should have known that the aforesaid releases of toxins would injure the health and property of plaintiffs and class members. Defendants have breached their duty by failing to use reasonable care at all times relevant to avoid the aforesaid contamination of plaintiffs and class members person and property.

38

169. As a direct and proximate result of defendants' breach of duty, plaintiffs and class members suffered injuries and damages.

Wherefore, plaintiffs on behalf of themselves and the class members demand judgment of and from the defendants, and each of them, in an amount and manner hereinafter prayed for.

## COUNT VI

### GROSS NEGLIGENCE

170. Plaintiffs repeat, reassert and re-allege each and every allegation contained herein above the same as though fully set forth in this Count verbatim.

171. Defendants' release of hazardous toxins as aforesaid into the Somerville area was willful, wanton and violated the duty of care owed to the plaintiffs and class members. Defendants exhibited a reckless disregard for the lives, health, and property of plaintiffs and class members.

172. As a direct and proximate result of defendants' breach of duty by defendants' willful and wanton acts, plaintiffs and class members suffered injury and damages. Defendants' gross negligence, willful and wanton acts entitle plaintiffs and class members to punitive damages in an amount sufficient to deter future bad conduct as aforesaid by these defendants and others who would choose in the future to engage in similar bad conduct.

## COUNT V

## MEDICAL MONITORING

173.  The plaintiffs incorporate each and every paragraph and allegation in the foregoing Counts the same as though each were fully set forth verbatim herein in the first instance.

174. Sampling data establishes that the communities surrounding the Somerville Plant site are highly contaminated with the aforesaid toxins.

175.  Current exposure levels for the general population to dioxin is at or below the detection limit of 4 parts per trillion 2,3,7,8 TCDD or its TEQ.  Plaintiffs and the putative class members are at risk of exposure to dioxin at levels higher than the TEQ of 4 pot dioxin.

176.  Dioxin, one of the toxins released by the wood treatment defendants, is a known human carcinogen and is so hazardous to human health that no "safe" level of exposure has been established.  Likewise coal tar creosote and its many constituents contain many known human carcinogens.  Many of these compounds likewise present the clear risk of respiratory ailments as well as presenting the risk of damage and injury to major organ systems including the kidneys, liver, central, peripheral and autonomic nervous systems.

177.  The defendants' activities, as aforesaid, caused the plaintiffs and the members of the putative class to be exposed to contamination in the air, soil, and in the

homes, places of employment, governmental buildings, schools and public places of the plaintiffs and class members.

178.  Because of the extraordinarily high toxin levels in the environments of the effected communities, the plaintiffs and the members of the putative class are at an increased risk of contracting one or more serious and life threatening and life ending diseases including, but not limited to the following:

      a.  Chloracne, biochemical liver-test abnormalities, elevated blood lipids, fetal injury, and porphyria cutanea tarda;

      b. Hormonal , neurologic, and immunologic injuries;

      c. Carcinogenic, genetic, reproductive, and developmental effects;

      d.  Non-Hodgkin's lymphoma, Hodgkin's lymphoma, and soft tissue sarcoma;

      e. Respiratory illnesses.

179.  Early detection of the various cancers, blood diseases, endocrine diseases and developmental abnormalities increases the chances for successful treatment and management of the aforesaid adverse health conditions it is reasonably necessary for the plaintiffs to undergo periodic health monitoring and medical examinations different than medical care, examinations, and treatment plaintiffs and members of the putative class would undergo in the normal course of their lives had the complained of exposures not occurred.

180.  Medical monitoring procedures exist that make early detection of the adverse medical conditions herein complained of possible and desirable.

181.  Wherefore plaintiffs on behalf of themselves and the putative class members demand judgment of and from the defendants and each of them in an amount and manner which will assure the costs of medical monitoring will be paid.

## DEMAND FOR JUDGEMENT

182.  The representative plaintiffs, on behalf of the putative classes demand as follows:

a.  For the Propertied Plaintiffs and the putative class members making up the Propertied class, an amount adequate to compensate for loss of value of real estate and any improvements thereon, including the loss of use, any clean up costs and in the event of a total loss, the loss of the intrinsic value of a home.  And the Propertied Plaintiffs further demand an amount sufficient to test their homes, buildings, and other property to determine the levels of dioxins/furans and other contaminants and toxins.

b. For the Medical Monitoring classes an amount sufficient to provide for testing of their persons to determine body burden of dioxins/furans and other toxins and an amount sufficient to insure ongoing examinations and tests to provide for early detection of disease.

c.   For the entire class of persons adversely affected by dioxins/furans, PAH and other toxic contamination, as aforesaid, sufficient funds and

42

monies to test the entire Class Affected area to determine the extent and nature of the contamination along with sufficient funds to effect an environmental cleanup to restore the affected communities to environmental health.

           d.  For the entire class of persons, an order directing that the defendants be permanently enjoined from further releases of toxins from the Somerville plant site.

           e.  Inasmuch as the conduct of the defendants has been characterized by deliberate and willful conduct in causing the contamination and because the defendants have over the years engaged in fraudulent cover-ups of the risks of dioxins/furans this case is appropriate for an award of punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief as follows as to all counts:

           183.  That this action be certified as a class action on behalf of the class described herein; and,

           184.  That the named plaintiffs be designated as representatives of the class and any subclasses and that the named counsel be designated class counsel; and,

           185.  That a court-supervised medical monitoring program be created to assure early diagnosis and treatment of injuries resulting from exposure to the hazardous toxins hereinabove described; and,

186. That the plaintiffs and class members receive all compensatory damages to which they are entitled; and,

187. That the defendants be required to remediate the contamination above described; and,

188. That the defendants be enjoined from further contamination of the Somerville area as above described; and,

189. That punitive damages be awarded in an amount to deter future bad conduct on the part of these defendants; and,

190. That the defendants be required to pay the costs of developing a notice plan and the costs of implementing a notice plan that satisfies due process concerns for the purpose of notifying those members of the putative class of the existence of this action and of their claims; and,

191. That an award of attorneys' fees, expenses and costs of this action and all other relief to which the plaintiffs are entitled be made in favor of plaintiffs and the class.

**PLAINTIFFS DEMAND A TRIAL BY JURY AS TO ALL COUNTS.**

44

Respectfully submitted,

Grover G. Hankins
Texas Bar No. 00795895
The Hankins Law Firm, PLLC
616 W. Main Street
League City, Texas 77573
281-316-9551
281-316-9552 facsimile

Dwight E. Jefferson
Texas Bar No. 10605600
Twelve Greenway Plaza #1100
Houston, Texas 77046
713-993-0399
713-993-0669 facsimile

Bernard Smalley
Anapol, Schwartz, Weiss, Cohan, Feldman
& Smalley
1900 Delancey Place
Philadelphia, Pennsylvania 19103
215-735-3864
215-735-3158 facsimile

45