# EXHIBIT F



CAUSE NO. 096-212936-05

| | | |
|---|---|---|
| **JASON HENSEN**<br>**Plaintiff,** | § § § § | **IN THE DISTRICT COURT** |
| **VS.** | § § § | **96TH JUDICIAL DISTRICT** |
| **BURLINGTON NORTHERN SANTA**<br>**FE RAILWAY COMPANY**<br>**Defendant.** | § § § § | **TARRANT COUNTY, TEXAS** |

## ORIGINAL PETITION IN INTERVENTION

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Intervenors (a complete list of Intervenors' names is attached as Attachment "A") and file this, their Original Petition in Intervention, as parties-Plaintiff, complaining of Defendants Koppers Industries, Inc. and Burlington Northern Santa Fe Railway Company, and respectfully show this Honorable Court and Jury as follows:

### I.
### DISCOVERY

1.1    Discovery should be conducted under Rule 190.3 (Level 3) of the TEXAS RULES OF CIVIL PROCEDURE.

### II.
### PARTIES

2.1    Intervenors are residents or former residents of Somerville, Burleson County, Texas, and are citizens of Texas. Intervenors sue individually and as Representatives of the Estates of the respective Decedents as described in Attachment "A". Each of the Intervenors, or each of the Decedents or minor children upon whose behalf the Intervenors appear, occupied, owned, or has been assigned rights to any

cause of action that could be asserted by previous owners of, property in the Somerville area at the time during which the injury alleged herein occurred.

2.2    Defendant Koppers Industries, Inc. ("Koppers") is a Pennsylvania corporation that conducts business in Texas from which it derives substantial profits. Koppers may be served through its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 701 Brazos Street, Suite 1050, Austin, Texas 78701.

2.3.    Defendant Burlington Northern and Santa Fe Railway Corporation ("BNSF") is a Delaware corporation with its principal place of business in Texas, so that it is a citizen of Texas for purposes of diversity jurisdiction, and it conducts business in Texas from which it derives substantial profits. BNSF may be served through its registered agent, CT Corporation System, 350 N. St. Paul Street, Dallas, Texas 75201. BNSF has appeared and answered.  A copy of this Petition will be forwarded to Douglas W. Poole, attorney of record for Defendant at 802 Rosenberg – P.O. Box 629, Galveston, Texas 77533, under the provisions of Rules 21 and 21a.

### III.
### JURISDICTION AND VENUE

3.1    Jurisdiction is appropriate in this Court because this is a lawsuit seeking damages in excess of the minimum jurisdictional limits of the district courts of the State of Texas.

3.2    The Court has personal jurisdiction over these Defendants because they have the requisite contacts with Texas, both specific and general, for the exercise of jurisdiction and such exercise of jurisdiction does not offend the traditional notions of fair play and substantial justice.

3.3    Intervenors are not asserting any claims or causes of action based on federal laws, treaties, or the United States Constitution, and there is not complete diversity of citizenship between all Intervenors and all Defendants so that even though many of the claims being asserted herein have a value in excess of $75,000, a federal court does not have jurisdiction over this action, and removal would be improper.

3.4    Venue is proper in Tarrant County pursuant to §15.002 of the TEXAS CIVIL PRACTICE & REMEDIES CODE because a substantial part of the events or omissions giving cause to the claims occurred in Burleson County, Texas and Defendant BNSF is not a natural person and has its principal office in Texas located in Tarrant County, Texas. Intervenors' Petition does not assert an action for recovery of damages to real property.

## IV.
## THE ORIGINAL LAWSUIT

4.1    On November 25, 2003, Plaintiffs sued Defendant BNSF and former-defendant Koppers in Brazoria County, Texas for damages arising out of exposure to toxic chemicals from a wood treatment center in Burleson County. Defendant BNSF filed an answer asserting: (1) a general denial; (2) the doctrine of comparative fault; (3) Plaintiffs' damages were the result of the conduct of third parties not under BNSF's control; (4) Plaintiffs' damages were caused by pre-existing conditions or other contributory or concurrent conditions or factors; (5) Plaintiffs' claims were barred by the applicable statute of limitations; (6) Plaintiffs' conditions did not result from any acts of omissions of BNSF. Although subsequently dismissed without prejudice by Plaintiffs, former-defendant Koppers filed an answer to Plaintiffs' Original Petition asserting: (1) a general denial; (2) Plaintiffs' claims were barred by the applicable statute of limitations; (3) Plaintiffs' claims were barred by the lack of privity; (4) the doctrine of comparative fault; (5) Plaintiffs' damages were the result of the conduct of third parties not under

Koppers' control; (6) the doctrine of sole proximate cause; (7) the defense of material alteration; (8) the defense of new and independent cause and intervening cause; (9) its product was state-of-the-art; (10) Plaintiffs' claims were barred by the doctrine of laches; (11) the defense of misuse; (12) Plaintiffs' claims were barred by the "learned intermediary" or "informed intermediary" doctrine and/or the principles of §338 of the Restatement (Second) of Torts; (13) a basis exists for apportioning the harm alleged, thus precluding the imposition of joint and several liability; (14) its liability should be limited to the proportionate share by which its conduct caused or contributed to the alleged release or threat of release of hazardous substances, taking into account the contribution of other responsible parties; (15) Plaintiffs' claims or causes of action are preempted by federal law; and (16) various purported defenses against punitive damages.

## V.
### FACTUAL BASIS OF INTERVENORS' CLAIMS

5.1    As shown below, Intervenor's claims arise from the same transaction or occurrence alleged in Plaintiffs' Original Petition. Likewise, Intervenor's claims involve issues of fact and law that are common to the claims of Plaintiffs. Intervenors are residents or former residents of Somerville, Burleson County, Texas. Intervenors are victims of cancer and other bodily injuries, as well as other damage, arising out exposure to toxic chemicals from a wood treatment facility located in Burleson County. This suit arises out of the operations and activities of the Defendants in the County with regard to the use and lack of containment of toxic chemicals used at the facility, which have caused them injuries and damages.

### The Wood Treatment Facility

5.2     The Somerville facility, at which BNSF operated and Koppers operates a wood treatment plant, occupies a 200-acre tract of land approximately one mile northwest of the intersection of Highway 36 and FM 1361 on the northeastern edge of the city of Somerville in Burleson County, Texas.  The Somerville wood treatment facility was constructed by Ayer and Lord in 1897 and treated railroad ties by contract for The Atchison, Topeka and Santa Fe Railway Company (AT & SF) under the name of Texas Tie and Lumber Preserving Company (TT & LPC).

5.3     In January 1905, the plant was purchased by AT & SF.  TT & LPC operated the original Somerville plant until 1905.  It was then dismantled in favor of a new facility built nearby, which is the present site of the plant.  The new plant began production in February 1906, and on December 2, 1912, the plant's name was changed to Santa Fe Tie and Lumber Preserving Company.  On June 2, 1950, the Santa Fe Railway (AT & SF) absorbed this subsidiary.  On March 28, 1995, AT & SF sold the Somerville wood treatment facility to the Koppers.  AT & SF merged with and into the Defendant BNSF on December 31, 1996.

5.4     BNSF has represented to the Texas Natural Resource Conservation Commission ("TNRCC") that it assumes responsibility for the historic contamination of the Somerville site.

### Chemical Involvement

5.5     From its inception in the late 1800's and continuing today, the wood treatment facility has and does today manufacture railroad cross ties, bride timbers, poles, piling, and other wood products all of which are treated on site with one or more pesticides and wood preservatives including derivatives of coal tar creosote and chlorinated pesticide compounds including pentachlorophenol (PCP).  PCP is toxic to

the environment and man, and exposure to it causes damage to the liver, kidneys, blood, and nervous system, and it is a human carcinogen.

5.6    The Somerville site wood manufacturing process consists of vapor drying the various shaped wood pieces followed by pressure treating the wood with creosote/oil mixtures as well as certain pesticidal extenders and chlorinated pesticides including the aforesaid PCP. The resulting treated wood products are used in the railroad industry.

5.7    Coal tars are by-products of the carbonization of coal to produce coke and/or natural gas. Coal tars are complex combinations of polycyclic aromatic hydrocarbons (PAHs), phenols, heterocyclic oxygen, sulfur, and nitrogen compounds. Coal tar creosotes are distillation products of coal tar.

5.8    Coal tar creosotes consist of aromatic hydrocarbons, anthracene, naphthalene, and phenanthrene derivatives. At least 75 per cent of coal tar creosote mixture is made up of PAHs. PAHs are toxic to the environment and man and are human carcinogens.

5.9    The composition of the creosote mixture is dependent on the sources and preparation parameters of the coal tar, and as a result, the creosote components are rarely consistent in their type and concentration. An example of the composition variability among creosote samples was recently presented by *Weyand et al.* (1991). In that study, the concentrations of several PAHs were analyzed in four coal tars. All of the PAHs identified exhibited 2-fold to nearly 20-fold differences in concentration among the four samples.

5.10    The coal tar creosote mixtures at issue here represent 100 years of different formulations used at the Somerville site. These formulations contained from time to time 199 identifiable PAHs including benzo(a)pyrenes and dibenzofurans. Coal tar

creosote (creosote) is a soup of hundreds, if not thousands, of compounds most of which are toxic to the environment and man.

5.11    To this creosote soup, extenders including, but not limited to, PCP are added to create the "creosote" utilized in the pressure treatment of wood at facilities like Somerville.

5.12    PCP is a chlorinated compound used as a pesticide in the treatment of specialty wood products such as poles and railroad ties and other applications where wood comes into contact with soil making it vulnerable to insect attack.  Often in the past PCP was used in the creosote treatment of specialty products.  On information and belief PCP compounds were used in the treatment of specialty wood products at the Somerville site at relevant times.

5.13    During the manufacturing process of PCP, dioxins are formed as an unwanted by-product of production.  Further, given the chemical make-up of PCP, it is a likely generator of dioxins and furans when subjected to heat and pressure of the sort utilized in the pressure treatment of specialty wood products at the Somerville facility.

5.14    Because of the availability of benzene in coal tar creosote, a source of chlorine in an environment of heat and pressure together with oxygen presents the opportunity for a variety of dioxins and furans to form during the tie treating process.

5.15    Creosote and its constituent compounds, PCP, dioxins and furans, are toxic and harmful to the environment and man.  For purposes of this Petition, all of these toxic and hazardous materials will often be referred to collectively as the "chemicals, solvents, and substances" and sometimes as the "products in question."

**Intervenors' Chemical Exposure**

5.16    During the operative time period from 1905 to present, BNSF and Koppers operated the wood treatment facility at Somerville that encompassed the use of large

metal cylinders into which shaped wood products would be placed.  Under pressure and heat, creosote and other pesticides would infuse the wood and displace water thus impregnating the railroad ties and other products with the aforesaid pesticides.

5.17    Currently, the Somerville plant utilizes four cylinders, which are 8 feet in diameter and 155 feet long, into which specialty wood is placed for pressure treatment.

5.18    Because of the magnitude of the treatment operation at Somerville, enormous quantities of creosote and other pesticides have in the past and currently are being utilized on a daily basis.  BNSF and Koppers have caused the release of these toxic and hazardous chemicals, solvents, and substances into the soil, groundwater, water, and air in and around the wood treatment facility.

5.19    Intervenors have been exposed and continue to be exposed to the toxic chemicals from the Somerville facility used to treat the wood products.  At some point in time unknown to Intervenors, these chemicals began to contaminate their bodies, property and homes.

5.20    Due to the size of the operation, extensive stacks of treated railroad ties and other treated products are, and at all relevant times in the past have been, placed on the ground for the purpose of "curing out."  Volatilized molecules of the aforesaid toxic compounds are released as gas from this process and are carried by the prevailing winds over the Somerville area.

5.21    Creosote and other pesticides drip from the curing treated wood products and leech into the soil causing contamination of the soil, surface water and groundwater including the aquifers underlying the Somerville area.

5.22    Independent testing has verified the presence of toxic compounds including dioxins/furans and PAHs inside the homes of Somerville residents.  Likewise, independent testing has verified the presence of toxic compounds including

dioxins/furans and PAHs in the residential soil of the Somerville area. The nature and make-up of the aforesaid compounds establish that the Somerville site is the generator of these compounds.

5.23    Governmental mandated testing of soil, sediment, surface and groundwater on the Somerville site has verified the presence of the aforesaid toxic and dangerous compounds.

5.24    The TNRCC has documented the contamination of the aquifer underlying the Somerville area. The TNRCC has also documented soil contamination at the Somerville site.

5.25    Surface water run-off from the Somerville site has carried contaminated sediment to the waters of Thompson Creek and other natural drainage features resulting in off site contamination of the Somerville area.

5.26    Natural wind patterns have dispersed throughout the air in Somerville toxic gasses created by the Somerville site.

5.27    Toxic contamination of the clothing of plant workers has caused harmful chemicals to contaminate the inside of their homes where family members and loved ones have been secondarily exposed to such contaminants.

5.28    Intervenors have experienced one or more of the following during the relevant time periods:

a.    Intermittent flooding of their property with surface water running from the contaminated Koppers' railroad tie treatment facility.

b.    Intermittent flooding of their property from Thompson Creek and other natural drains that receive contaminated surface water flowing from the Somerville railroad tie treatment facility.

---

c. Treated wood routinely provided to Intervenors by BNSF and Koppers as firewood in the homes of the Intervenors and in some cases used as cooking fuel.

d. Treated wood ties from time to time would be placed on or near the property of one or more of the Intervenors for storage prior to their being sold or removed by BNSF and Koppers for some other purpose.

e. Groundwater lying under the real estate of Intervenors has been and remains contaminated with the chemicals used by BNSF and Koppers as a consequence of the chemicals being spilled and otherwise placed on the soil of the treatment facility and otherwise placed in leaking containment ponds such that the groundwater and the aquifers underlying the Somerville area are now contaminated.

f. One or more of the Intervenors has in the past experienced "oily tasting" water drawn from fresh water wells in the Somerville area.

g. One or more of the Intervenors' houses and real estate have become contaminated with dioxins/furans, PAHs and other toxic molecules released from the wood treatment facility.

h. Noxious odors emanating from the wood treating facility.

i. Poisonous dusts released from the wood treatment facility that settle from the air onto their respective properties in the Somerville area.

5.29    PCP-containing products were routinely stored outside at the facility without cover or protection, allowing the chemicals to disperse throughout the neighborhood, contaminating Intervenors' homes, properties, and persons.

5.30    During the relevant time in question, BNSF and Koppers improperly disposed of unwanted chemicals and contaminated dirt by dumping the refuse outside at the facility, contaminating Intervenors' homes, properties, and persons.

5.31    As a consequence of the foregoing activities of the Defendants, but not limited to such, toxic substances including PAHs, dioxins/furans, arsenic and other dangerous and deadly toxins were at all relevant times generated and released from the Somerville site.

5.32    As a result of exposure to the toxic and hazardous chemicals, solvents, and substances, Intervenors have sustained bodily injuries, including cancer, blood diseases, diseases, and developmental abnormalities.

## CAUSES OF ACTION
### VI.
### NEGLIGENCE

6.1    Each of the statements and allegations made in Sections 5.1 to 5.32 above are specifically adopted and incorporated by reference herein as if set forth in full.

6.2    Koppers and BNSF committed various acts of omission and commission that constitute negligence and were a proximate cause of the injuries and damages of Intervenors.

6.3    Koppers and BNSF were negligent in allowing and failing to prevent the release of toxic and hazardous chemicals, solvents, and substances into the soil, groundwater, water, and air in and around the wood treatment facility they operated and/or owned.

6.4    Koppers and BNSF were negligent in failing to monitor their procedures and receipts of toxic and hazardous chemicals, solvents, and substances so that they

---

were released and escaped into the soil, groundwater, water, and air in and around the wood treatment facility they operated and/or owned.

6.5    Koppers and BNSF were negligent in failing to monitor the types and amounts of toxic and hazardous chemicals, solvents, and substances that were being released and that escaped into the soil, groundwater, water, and air in and around the wood treatment facility they operated and/or owned. Alternatively, Koppers and BNSF were negligent in the manner in which they undertook to monitor the types and amounts of toxic and hazardous chemicals, solvents, and substances that were being released and that escaped into the soil, groundwater, water, and air in and around the wood treatment facility they operated and/or owned, and such conduct increased the risk of harm and/or caused harm because it was relied upon by others to be performed with the appropriate standard of care.

6.6    Koppers and BNSF were negligent in improperly disposing of and failing to properly dispose of toxic and hazardous chemicals, solvents, substances, waste materials, byproducts and effluents of the wood treatment process so that they were released and escaped into the soil, groundwater, water, and air in and around the wood treatment facility they operated and/or owned.

6.7    Koppers and BNSF were negligent in failing to warn the Intervenors and others in the general public of the toxic and hazardous chemicals, solvents, and substances that they knew, or in the exercise of reasonable ordinary care should have known, were being released and escaped into the soil, groundwater, water, and air in and around the wood treatment facility they operated and/or owned.

6.8    Koppers and BNSF were negligent in failing to warn Intervenors and others in the general public of the dangers and potential bodily harm that could be caused by the toxic and hazardous chemicals, solvents, and substances that they knew,

or in the exercise of reasonable ordinary care should have known, could result from exposure to the toxic and hazardous chemicals, solvents, and substances that were being released and escaping into the soil, groundwater, water, and air in and around the wood treatment facility they operated and/or owned.

6.9    Koppers and BNSF were negligent in creating an unreasonable risk of harm by exposing Intervenors to the toxic and hazardous chemicals, solvents, and substances that they were causing to be released into the soil, groundwater, water, and air.

6.10    Koppers and BNSF were negligent in failing to intervene in a timely manner to prevent, contain, monitor, or control the toxic and hazardous chemicals, solvents, and substances that were being released into the soil, groundwater, water, and air, which could have minimized or eliminated Intervenors' exposure to the toxic and hazardous chemicals, solvents, and substances.

6.11    Koppers and BNSF were negligent in failing to implement and enforce procedures with regard to industrial hygiene that resulted in increased exposure to the toxic and hazardous chemicals, solvents, and substances that were being used at the wood treatment facility they operated and/or owned.

6.12    The above-referenced negligent acts and omissions of Koppers and BNSF were a proximate cause of the deaths of Decedents and Intervenors' injuries and damages.

## VII.
### NUISANCE AND NUISANCE PER SE

7.1    Each of the statements and allegations made in Sections 5.1 to 5.32 above are specifically adopted and incorporated by reference herein as if set forth in full.

---

7.2    Koppers and BNSF, through negligent, intentional and unreasonable, and other conduct that was abnormal and out of place in its surroundings, interfered with and/or invaded the rights and interests of Intervenors and/or Decedents who own, owned, occupied, or occupy land nearby the wood treatment facility operated and/or owned by Koppers and BNSF that was affected by the escape or release of toxic and hazardous chemicals, solvents, and substances in these Intervenors' and Decedents' soil, groundwater, water, and air, and substantially interfered with Intervenors' private use and enjoyment of the land, causing injuries and damages to Intervenors and Decedents.  Koppers and BNSF knew, or should have known, that the release of these toxic and hazardous chemicals, solvents, and substances were causing a substantial and unreasonable interference with Intervenors' and/or Decedents' property interests. Even if the conduct of Koppers and BNSF had not been intentional, it is still an actionable nuisance because they knew the toxic and hazardous chemicals, solvents, and substances were abnormally dangerous and that their release was an abnormally dangerous activity and created an abnormally dangerous condition.  This activity constitutes a nuisance at all times, under any circumstances, and in any location. Defendants' conduct constitutes a nuisance, a nuisance per se, and/or an intentional nuisance.

7.3    The damages and injuries sustained by Intervenors and Decedents because of the nuisance caused by Koppers and BNSF include, but are not limited to, death, personal discomfort, annoyance, inconvenience, impairment of health, physical pain and mental anguish, all of which occurred in the past and in reasonable probability will continue in the future.

7.4    The conduct of Koppers and BNSF in releasing these toxic and hazardous chemicals, solvents, and substances into the soil, groundwater, water, and air in and

around the wood treatment facility constitutes an abnormally dangerous activity, so that Koppers and BNSF are strictly liable for all foreseeable harm to Intervenors and Decedents resulting from that activity, even if Koppers or BNSF had exercised care to prevent the harm.

## VIII.
### TRESPASS

8.1    Each of the statements and allegations made in Sections 5.1 to 5.32 above are specifically adopted and incorporated by reference herein as if set forth in full.

8.2    Koppers and BNSF released toxic and hazardous chemicals, solvents, and substances into the soil, groundwater, water, and air that encroached upon and entered into and onto the real property of Intervenors, in a way that was physical, intentional and voluntary by Koppers and BNSF.  These releases and trespasses, whether the result of negligence, recklessness, or intentional conduct involving abnormally dangerous activity, caused injury to Intervenors' right of possession, resulting in personal injury and damage to Intervenors and Decedents, including mental anguish and physical injury resulting from fright.

## IX.
### GROSS NEGLIGENCE

9.1    Each of the statements and allegations made in Sections 5.1 to 5.32 above are specifically adopted and incorporated by reference herein as if set forth in full.

9.2    The acts and omissions of Koppers and BNSF constitute gross negligence because they had subjective awareness that their conduct involved an extreme degree of risk but proceeded and continued with conscious indifference to the rights, safety, and welfare of Intervenors and Decedents.

9.3    Koppers and BNSF knew that the chemicals, solvents, and substances that they were causing to be released into the soil, groundwater, water, and air in and

around their wood treatment facility were toxic and hazardous. They knew that these chemicals, solvents, and substances would cause grave, sometimes fatal, injuries to the people in and around the facility. Despite their knowledge, Koppers and BNSF consciously disregarded the rights, safety, and welfare of the general public, including Intervenors, in proceeding to cause and allow these toxic and hazardous chemicals, solvents, and substances to escape from the facility and cause significant and pervasive bodily injuries and deaths to Decedents, Intervenors and others.

9.4    This conduct was known and directed by managers and officers of Koppers and BNSF and was a proximate cause of Intervenors' injuries and damages and Decedents' deaths.

## X.
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

10.1    Each of the statements and allegations made in Sections 5.1 to 5.32 above are specifically adopted and incorporated by reference herein as if set forth in full.

10.2    Koppers and BNSF had full knowledge of the nature and toxicity of the toxic and hazardous chemicals, solvents, and substances they were freely releasing into the ground, groundwater, water, and air, and knew the grave, and sometimes fatal, consequences to the Decedents, Intervenors and persons of the general public in and around the wood treatment facility. Koppers and BNSF nevertheless made a conscious decision to disregard the risk to Decedents and Intervenors and to endanger their lives.

10.3    This conduct of Koppers and BNSF constitutes a flagrant disregard for the rights and safety of Intervenors and Decedents that resulted in bodily injuries, death, and damage and, as such was extreme and outrageous.

10.4    This conduct of Koppers and BNSF was a proximate cause of the severe emotional distress that has been suffered by Intervenors and Decedents. Intervenors' severe emotional distress will continue in the future.

## XI.
### GENERAL AGENCY ALLEGATIONS

11.1    Whenever in this Petition it is alleged that a corporate Defendant did any act or omission it is meant that Defendants' officers, agents, servants, employees, joint venturers, partners, joint enterprisers and/or representatives did such act or omission, and that at the time such act or omission was done, it was done with the full authorization and/or ratification of that Defendant, and was done in the normal and routine course and scope of the employment of Defendants' officers, agents, servants, employees, joint venturers, partners, joint enterprisers or representatives.

## XII.
### FRAUDULENT CONCEALMENT, DISCOVERY RULE,
### ESTOPPEL, AND TOLLING OF LIMITATIONS

12.1    The accrual of Intervenors' causes of action, and the running of any applicable statute of limitations, has been deferred by Defendants' acts of fraudulent concealment. These include, but are not limited to, failing to disclose, and in fact suppressing, information concerning: (a) the injurious nature of their activities; (b) the fact that the toxic and hazardous chemicals, solvents, and substances were being released into the soil, groundwater, water, and air in and around the wood treatment facility; and (c) the harmful effects associated with continued exposure to the toxic and hazardous chemicals, solvents, and substances to the Intervenors and others residing near the wood treatment facility. Defendants concealed the results of their health monitoring of certain employees. Defendants also concealed from federal and state governmental agencies their conduct involving the toxic and hazardous chemicals,

solvents, and substances. Defendants had actual knowledge of these wrongs, but concealed the wrongs by making misrepresentations and/or by remaining silent when they had a duty to speak. Further, Defendants had a fixed purpose to conceal the wrongs. Intervenors and Decedents reasonably relied on Defendants' misrepresentations and/or silence. Intervenors brought their claims promptly when they reasonably knew or should have known based upon a reasonably diligent inquiry that their injuries and damages were caused by the wrongful acts of Defendants.

12.2    Further and alternatively, the accrual of Intervenors' causes of action have been deferred because many or all of Intervenors' injuries were inherently undiscoverable and objectively verifiable. Further, Intervenors' action is brought under State law for personal injuries, which are caused or contributed to by exposure to a hazardous substance, pollutant, or contaminant released into the environment from a facility.

12.3    Further and alternatively, with regard to any allegations Defendants may make as to statute of limitations, Intervenors plead equitable estoppel. Defendants, with actual or constructive knowledge, have materially misrepresented or concealed facts by contending that their activities were not harmful and injurious. Defendants are now estopped from contending that Intervenors knew or should have known that the Defendants' activities were in fact harmful or injurious.

12.4    Further and alternatively, sections 16.001 and 16.062 of the TEXAS CIVIL PRACTICE AND REMEDIES CODE suspend the running of statutes of limitations applicable to the claims asserted by particular Intervenors.

## DAMAGES

### XIII.
#### PERSONAL INJURY DAMAGES

13.1    Intervenors seek compensatory damages arising from their injuries suffered as a result of the wrongful conduct of Defendants.   Intervenors seek monetary damages from Defendants to compensate them for the following elements of damages:

- past and future medical expenses;
- past and future loss of earning capacity;
- past and future pain and suffering;
- past and future mental anguish;
- past and future physical impairment; and
- past and future disfigurement.

### XIV.
#### WRONGFUL DEATH DAMAGES

14.1    As a result of the deaths of Decedents, Intervenors seek monetary damages to compensate them for the following elements of damages:

- past and future pecuniary loss;
- past and future loss of companionship and society; and
- past and future mental anguish.

### XV.
#### THE ESTATES OF DECEDENTS

15.1    As a result of the deaths of Decedents, their estates seek monetary damages to compensate for the following elements of damages:

- pain and suffering of Decedents;
- mental anguish of Decedents; and
- medical, funeral, burial expenses of Decedents.

## XVI.
### PUNITIVE DAMAGES

16.1    Because Defendants are guilty of gross negligence, they should have punitive damages assessed against them in an amount deemed appropriate by the jury.

## XVII.
### PRE-JUDGMENT AND POST-JUDGMENT INTEREST

17.1    Intervenors seek recovery of pre-judgment and post-judgment interest as permitted by law.

## XVIII.
### RESERVATION OF RIGHTS

18.1    Intervenors reserve the right to prove the amount of damages at trial and to amend their Petition to add additional claims upon further discovery and as their investigation continues.

## XIX.
### CONDITIONS PRECEDENT

19.1    Pursuant to Rule 54 of the TEXAS RULES OF CIVIL PROCEDURE, all conditions precedent to Intervenors' rights to recover herein and to Defendants' liability have been performed or have occurred.

## XX.
### REQUESTS FOR DISCLOSURE

20.1    Pursuant to TEX. R. CIV. P. 194, Intervenors request that Defendants disclose, within 30 days of service of this Request, the information and material described in Rule 194.2(a) through (l).

## XXI.
### REQUEST FOR JURY TRIAL

21.1    In accordance with Rule 216 of the TEXAS RULES OF CIVIL PROCEDURE, Intervenors request a trial by jury.

## XXII.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Intervenors request that Defendants be cited to appear and answer herein, that this cause be set for trial before a jury, and that Intervenors recover judgment of and from Defendants for their actual and exemplary damages in such an amount as the evidence may show and the jury may determine to be proper, together with pre-judgment interest, post-judgment interest, costs of suit, and such other and further relief to which Intervenors may show themselves to be justly entitled at law or in equity.

Respectfully submitted

**WATTS LAW FIRM, L.L.P.**
111 Congress Avenue, Suite 1000
Austin, Texas 78701
512-479-0500
512-473-0328 (fax)


By: _____
James L. "Larry" Wright
State Bar No. 22038500
Daniel A. Longoria
State Bar No. 24055867

**ATTORNEYS FOR INTERVENORS**

**THE HANKINS LAW FIRM**
Grover G. Hankins
440 Louisiana Street, Suite 725
Houston, TX 77002
713-292-2720
713-292-2729 (fax)
State Bar No. 00795895

**ATTORNEYS FOR INTERVENORS**

Dwight E. Jefferson, P.L.L.C.
405 Main Street, Suite 950
Houston, TX 77002
713-222-1222
713-222-1223 (fax)
State Bar No. 10605600

**ATTORNEYS FOR INTERVENORS**

## CERTIFICATE OF SERVICE

By my signature above, I hereby certify that a true and correct copy of the foregoing document was forwarded to all counsel of record by facsimile, certified mail, return receipt requested, and/or hand delivery, on this the **10th** day of May, 2007.

*Via Facsimile 713-751-3058*
Jared R. Woodfill
Brent Haynes
**WOODFILL & PRESSLER, LLP**
1330 Post Oak Blvd., Suite 2800
Houston, TX 77030

*Via Facsimile 713-683-1292*
Mark Berry
**JONES & GRANGER**
10000 Memorial Drive, Suite 888
Houston, TX 77024

*Via CM-RRR #7005 1160 0005 3487 5411*
Mr. Douglas W. Poole
**MCLEOD, ALEXANDER, POWEL & APFFEL**
802 Rosenberg
P. O. Box 629
Galveston, TX 77553

## ATTACHMENT "A"

Clarence Edward Batts; Jimmy Blackwell; Charles H. Booker; Sedrick M. Bradley; Donna Faye Bree; Lisa M. Breedlove; Coppin Brown; Virda B. Bullard; Denise Burns; James Roy Burns; Earnest Carrathus; Clemmie Lee Carter; June Coleman; Farris Colvin; Letetia Crear; Ina Cross; J.L. Darden; Bobbie L. Davis; John Davis, Jr.; Marcelina Gonzales DeLeon; Billie Jean Denson; Charles Ray DeVault; Tom DeVault; Jasper Dotson; Frank L. Ewing; Nathan Ewing, Jr.; Ted Alexander Flemings; Ora Nell Ray Ford; Antoinette Grant; Carrie Lee Gray; Carolyn Joyce Henry; Dock Hester; Cantreas Lasha Hogues; Jesse Loyd Hogues; Luman Holloway; Sharon Holloway; Lilly M. Holmes; Joyce Marie Houston; Austin Jackson; Kisha Jackson; Thomas Jackson; Wanda Jewel Johnson; Colquitt Kennerson; Charles King; Willie Lavan; Bobbie Jean Lovings-McCartney; Donaciano E. Martinez; Shaundra Martinez; Marie Mathis; Ruby Lee Mitchell Mathis; James W. McCoy; Jane G. McCullough; Gilbert McNeil; James Melton; Clint Molett; Beverly Rose Moore; Charlie James Moore; Sharla Moore; Shirley Ann Moore; Stephanie E. Moore; Walter E. Nix, Jr.; Claurence Lawrence Nix; Walter E. Nix, Sr.; Luella Ray; Mechernette Redic; Clifton Arnold Roberts; Ozell Roberts; Rhonda Rogers; Leroy Ross; Elizabeth Sauage; Wanda Faye Scarlett-Bass; Jessie Schultz; Iola Scott; Angelina Taplin; Eva Clyde Taylor; Russell C. Taylor; Patricia A. Tolbert; Floyd Townsend; Beatrice Townsend-Hurd; Mary Helen Vasquez; Rita Y. Vasquez; Mae Ruth Watson; Edward J. Williams; Leona Williams; Lloyd Williams; Kenneth B. Williams, Sr.; Martin Wise, Sr.; Clara Woodford; Maggie Dawson as Representative of the Estate of Versie B. Lister, Deceased; Ozell Roberts as Representative of the Estate of Arlinda Roberts, Deceased; Gloria Wiley as Representative of the Estate of Henry Wiley, Deceased; and Deanya Randale as Representative of the Estate of James Williams, Sr., Deceased.