# EXHIBIT H

IN THE DISTRICT COURT OF BURLESON COUNTY, TEXAS

21ST JUDICIAL DISTRICT

DOUGLAS E. MOSES,                    )

       Plaintiff,              )

   vs.                              ) Case No. 24588

BURLINGTON NORTHERN SANTA FE    )

RAILWAY COMPANY,                     )

       Defendant.              )


The videographic discovery deposition of

RAJA K. KHURI, M.D., taken in the above-entitled

cause, before Gina M. Luordo, a notary public of

Cook County, Illinois, on November 19, 2007, at 200

North LaSalle Street, Chicago, Illinois, at the

time of 9:31 a.m., pursuant to Notice.


Reported By:  Gina M. Luordo, CSR, RPR, CRR

License No.:  084-004143

Page 10

1  BY MR. FLOYD:
2      Q.   All right, sir.  Were you able to pull out
3  all of the medical literature you relied on in
4  preparation for your report that's marked as
5  Exhibit No. 2 for me?
6      A.   Yes.
7      Q.   Very good.
8           Now, what other documents did you review
9  in preparation for the report that we have in front
10 of you that's marked as Exhibit No. 2?
11     A.   Affidavit by Dr. Dahlgren and the
12 toxicology reports.
13     Q.   What toxicology reports?
14     A.   Dr. Cheremisinoff, and -- what's his name?
15 His name escapes me right now.
16     Q.   And where would we find those documents?
17     MR. HOLLOWAY:  Do you want me to suggest?  I
18 think I know what he's talking about.
19 BY MR. FLOYD:
20     Q.   Rosenfeld and Cheremisinoff is what you're
21 talking about, but what documents?  Where are they?
22     A.   This is Dr. Dahlgren's affidavit.
23     Q.   Okay.  So now we're looking for the
24 toxicology reports, correct?

Page 11

1      A.   Yes.
2      Q.   All right.
3      A.   I don't have it.
4      Q.   Where are the toxicology reports referred
5  to in your report that's marked as Exhibit No. 2?
6  Where does it refer to those toxicology reports
7  that you're referring to, sir?
8      A.   I don't refer to them specifically.
9      Q.   Okay.  What do you recall about the
10 toxicology reports that you utilized in your
11 report?
12     A.   The amount of exposure.
13     Q.   Tell me what the amount of exposure was.
14     A.   Without looking at the report, I couldn't
15 recite the numbers for you, but it was significant
16 exposure.
17     Q.   What do you mean by significant exposure?
18     A.   High.
19     Q.   For what substances?
20     A.   For dioxin, for PAH, for other chemicals,
21 and I think there was arsenic and chromium.
22     Q.   Was this for exposure while he lived in
23 the city of Somerville, or was this for exposure
24 while he worked at the plant?

Page 12

1      A.   This was a study that was done at the city
2  of Somerville.
3      Q.   What did you look at regarding what
4  Mr. Davis's exposure would have been at the
5  Somerville tie plant?
6      A.   For what period of time?
7      Q.   For any period of time.
8      A.   None.
9      Q.   You're aware that industrial hygiene
10 assessments were done at the Somerville tie plant,
11 are you not, sir?
12     A.   What kind of industrial hygiene
13 assessments?
14     Q.   Industrial hygiene assessments of the air
15 were done at the Somerville tie plant, were they
16 not, sir?
17     A.   I haven't seen any such numbers.
18     Q.   You haven't seen any numbers?
19     A.   No.
20     Q.   Sir, weren't you the medical director for
21 the Santa Fe in the '80s?
22     A.   Yes.
23     Q.   And in the '70s?
24     A.   Yes.

Page 13

1      Q.   Weren't you the medical director in 1979
2  when NIOSH hired Stewart Todd & Associates to do an
3  industrial hygiene assessment of the Somerville tie
4  plant?
5      A.   I was never shown that assessment.
6      Q.   You were never shown that assessment?
7      A.   That is correct.
8      Q.   And you're absolutely sure about that?
9      A.   To the best of my memory.
10     Q.   And you're just as sure about that as you
11 are about everything else in this case; is that
12 right?
13     A.   I can't answer that question, sir.
14     Q.   All right.  So if I were to show you a
15 document where you actually were shown the Stewart
16 Todd & Associates industrial hygiene assessments,
17 would you say that you're wrong?
18     A.   Show me the -- I can't answer that
19 question until you show it to me.
20     Q.   Fair enough.  So let me see if I've got
21 this straight.  You were the medical director for
22 the Santa Fe in the late '70s and early '80s,
23 right?
24     A.   Yes.

4  (Pages 10 to 13)

Page 14

1    Q.  And you're saying that you never saw any
2    industrial hygiene assessments done by Stewart
3    Todd & Associates in 1979; is that correct?
4    A.  That is correct.
5    Q.  And what about the industrial hygiene
6    assessment that was done by Stewart Todd &
7    Associates for NIOSH in 1980, did you see that one?
8    A.  Again, to the best of my recollection, no.
9    Q.  Do you know who Dave Malter is?
10   A.  Yes.
11   Q.  Who's Dave Malter?
12   A.  He was industrial hygienist working in my
13   department.
14   Q.  Why did you hire Dave Malter?
15   A.  For industrial hygiene work.
16   Q.  Did you send Dave Malter to Somerville in
17   1980 to work with Stewart Todd & Associates when
18   they were doing the NIOSH industrial hygiene
19   assessment?
20   A.  You're asking a question.  I know that
21   Dave Malter went down in the 1980s to do a report
22   on the Somerville plant that's part of industrial
23   hygiene program all over the system.
24   Q.  Have you ever been to the Somerville tie

Page 15

1    plant?
2    A.  Yes, I have.
3    Q.  When was that?
4    A.  I can't remember the exact dates.  Around
5    1980.
6    Q.  Why did you go to the Somerville tie plant
7    in 1980?
8    A.  Because Dave had some concerns, and he
9    asked me to go along with him to go take a look at
10   it.
11   Q.  What concerns did Dave have?
12   A.  About the exposure of the employees, about
13   the absence of any protective systems, about the
14   cleaning of the tubes where they pressurized the
15   ties.
16   Q.  Did you meet with the employees when you
17   went to the Somerville tie plant?
18   A.  No.
19   Q.  Are you sure about that?
20   A.  If I did, briefly.
21   Q.  All right.  Let's take a look at your
22   report.  It's marked as Exhibit No. 2, all right?
23   A.  The first time I didn't when we did that
24   evaluation.

Page 16

1    Q.  All right.  Well, now I'm confused.  How
2    many times have you been --
3    A.  No, you're not confused.
4    Q.  How many times have you been to the
5    Somerville tie plant?
6    A.  Twice.
7    Q.  When was the first time?
8    A.  At the time that I went with Dave Malter,
9    it would be around 1980.
10   Q.  All right.  And in approximately 1980, you
11   went with Dave Malter?
12   A.  Yes.
13   Q.  Correct?
14   A.  Yes.
15   Q.  When was the second time?
16   A.  I can't recall the date.
17   Q.  Was it before or after 1980?
18   A.  Probably after.
19   Q.  Okay.  Why did you go the second time?
20   A.  It was probably on the safety tour.
21   Q.  Who did you go with?
22   A.  It would be the safety team.
23   Q.  Who was that?
24   A.  The safety team comprised of people from

Page 17

1    the operating department.  In this case in
2    Somerville, it was engineering.  It could be
3    somebody from engineering.
4    Q.  Go ahead.
5    A.  Plus, the plant management and probably
6    Dave Malter, but I don't recall that specifically.
7    Q.  Do you recall any of the names of the
8    individuals who were on the safety team during your
9    safety tour visit to the Somerville tie plant the
10   second time?
11   A.  No.
12   Q.  So the first time you went in 1980, did
13   you all have a safety meeting with the people who
14   worked at the Somerville tie plant?
15   A.  Did we have a safety meeting?
16   Q.  Yes.
17   A.  No.
18   Q.  Did you have a meeting at all with the
19   employees?
20   A.  No.
21   Q.  Did you have a meeting the second time you
22   went?
23   A.  It must have been because it was a safety
24   meeting.

5 (Pages 14 to 17)

Page 18

1     Q.  Okay.  Now, take a look at your report
2  that's marked as Exhibit No. 2, please.
3     A.  Yes.
4     Q.  And specifically I want to turn -- have
5  you turn to that area where Dennis Davis talked
6  about how -- you asked him questions.  Specifically
7  I'm thinking it's on Page number 2 starting on your
8  telephone interview with him.
9     A.  Yes.
10    Q.  All right.  So you had a telephone
11 interview with Mr. Davis?
12    A.  Yes.
13    Q.  All right.  I've got a document or a file
14 folder here that says telephone interview, Dennis
15 Davis phone interview.  Let me just hand that
16 document to you.  I don't see any notes other than
17 his name, address and phone number.  Do you have
18 any notes from that interview?
19    A.  I couldn't tell you.  Probably because I
20 do, and they're not here.
21    Q.  But you will admit, will you not, sir,
22 that in looking through the file that has Dennis
23 Ray Davis phone interview, there are no notes in
24 it?

Page 19

1     A.  That's correct.
2     Q.  Other than a yellow post-it note with some
3  phone numbers on it?
4     A.  That's correct.
5     Q.  And then a patient registration
6  occupational medical exam form that I'm going to
7  mark as Exhibit No. 5 to your deposition.  That's
8  the only notes that we have in the file relating to
9  your telephone interview with Dennis Davis; is that
10 fair?
11    A.  Yes.
12    Q.  All right.  Now, if we take a look at
13 starting at Page 2 at the bottom and going on to
14 Page 3, there's roughly about a page worth of
15 information from Dennis?
16    A.  Yes.
17    Q.  How did you -- how did you take down the
18 information that you got from Mr. Davis?  Did you
19 make notes?  Did you record it?  What did you do?
20    A.  You know, this was done when?  In
21 September?  My usual habit is to take notes, yes.
22    Q.  Okay.
23    A.  And then dictate it, and it will be typed.
24    Q.  Okay.  So do we know where the notes went?

Page 20

1     A.  I couldn't tell you now.  I would have to
2  look for them.
3     Q.  All right.  How would we find those?
4     A.  We'll ask my office.
5     Q.  Okay.  Now, take a look at Page No. 3,
6  sir.
7     A.  Yes.
8     Q.  Under occupation and environmental
9  history, the second full paragraph --
10    A.  Yes.
11    Q.  -- the second to the last sentence --
12    A.  Yes.
13    Q.  Well, he states that he never saw MSDS
14 posted.  Did I read that correctly?
15    A.  Yes.
16    Q.  The plant was big on physical safety, but
17 nothing about chemicals, end quote.  Did I read
18 that correctly?
19    A.  Yes, you did.
20    Q.  Then you went to say he told me -- he
21 asked me a question when I was at a safety meeting
22 in the tie plant, and he was the only one to ask a
23 question about exposure but was reprimanded.  Did I
24 read that correctly?

Page 21

1     A.  Yes, you did.
2     Q.  He alleges that he was told, quote, if I
3  wanted to keep his job, to keep his mouth shut, end
4  quote.  Did I read that correctly?
5     A.  You certainly did.
6     Q.  Do you recall meeting Mr. Davis?
7     A.  No.
8     Q.  Do you recall being in a safety meeting
9  where questions were asked?
10    A.  As I said, the safety meeting went -- was
11 not on the horizon when he mentioned it to me.
12    Q.  What do you mean?  I don't understand
13 that.
14    A.  I hadn't thought about the safety meeting.
15    Q.  All right.  Well, Mr. Davis said you were
16 there?
17    A.  Yes.
18    Q.  Right?
19    A.  Yes.
20    Q.  Mr. Davis says he asked you a question,
21 right?
22    A.  Yes.
23    Q.  What -- do you recall what question he
24 asked you?

6  (Pages 18 to 21)

Page 22

1     A.  No.
2     Q.  Did Mr. Davis recall what question he
3  asked you?
4     A.  We didn't talk about that.
5     Q.  You didn't?
6     A.  No.
7     Q.  Weren't you curious as to that?
8     A.  We just didn't talk about it.
9     Q.  So Dennis -- Mr. Davis tells you that he
10  asked you a question, but you didn't ask what
11  question he asked?
12     A.  I don't recall that I did or not.
13     Q.  Okay.  Do you recall talking to Mr. Davis
14  about what your response might have been?
15     A.  No.
16     Q.  Do you recall Mr. Davis talking to you
17  about what you talked about during the safety
18  meeting at the Somerville tie plant?
19     A.  No.
20     Q.  Do you recall anyone asking you any
21  questions --
22     A.  No.
23     Q.  -- at the safety meeting?
24        And do you recall anything about what you

Page 23

1  talked about at the safety meeting?
2     A.  No.  I would be purely opining now.
3     Q.  I mean, I'm just asking you if you have
4  any recollection of it?
5     A.  No.
6     Q.  Do you have any recollection about
7  anything that was discussed at the safety meeting?
8     A.  No.
9     Q.  Do you have any recollection about any
10  concerns that the employees might have had at that
11  safety meeting?
12     A.  No.
13     Q.  Do you recall about -- and you already
14  told me you don't recall who you were there with,
15  correct?
16     A.  That is correct.
17     Q.  And so you might have been there with Dave
18  Malter, but you don't remember?
19     A.  Correct.
20     Q.  And you don't know anybody else with the
21  railroad who was present at that safety meeting?
22     A.  I don't recall.  It's not that I don't
23  know.
24     Q.  Okay.  Fair enough.  I think that's a

Page 24

1  distinction without a difference, but let me ask
2  the question in a way that makes you comfortable.
3        Do you recall any of the other individuals
4  from the railroad who were at the safety meeting?
5     A.  No.
6     Q.  Do you recall the name of anybody, whether
7  they're railroad employees or anyone else, who was
8  at the safety meeting?
9     A.  No.
10     Q.  Now, the first time that you went down to
11  the tie plant in 1980, I want to discuss that with
12  you.  Do you recall going down there in the 1980s
13  with Dave Malter?
14     A.  That visit, I remember a lot about it,
15  yes.
16     Q.  Okay.  Tell me what you remember about
17  that visit.
18     A.  Dave had showed me the cylinders where the
19  wood is pressurized, and he told me that he wrote
20  up a system whereby these people who are working in
21  the cylinders must wear protective clothing and
22  respirators.  He also told me the story that
23  employees would go in to clean it up when we ask
24  them without any protective clothing or

Page 25

1  respirators, and they're usually tied with a rope.
2  If they happen to pass out, they would pull them
3  out.
4        I also saw a well with a greenish material
5  around it, and I asked, what is this, and I was
6  told that it was arsenic that was being used in the
7  wood and that's being taken out.  I also saw two
8  lakes of chemical affluent, and I was told that the
9  environmental -- that this is a concern for the
10  environmental group and that they will take care of
11  it.
12     Q.  What else do you remember about the trip?
13     A.  I couldn't tell you what I had for lunch.
14     Q.  Well, I'm really not that terribly
15  interested in what you had for lunch.  I'm really
16  more interested in what else you might have seen at
17  the plant.
18     A.  That was all primarily, yes, sir.
19     Q.  Did you discuss what particular chemicals
20  were being utilized at the plant in 1980?
21     A.  Creosote and arsenic, which I saw with my
22  eyes.  That was all at that time.
23     Q.  And when you said that -- I think you just
24  told me that they would use the arsenic in the

7 (Pages 22 to 25)

Page 34

1    Q.  Were you sorry to see him go when he went
2  off to another job?
3    A.  Well, in a way, yes, I was.
4    Q.  In what way?
5    A.  I mean, I'm just talking generally.
6    Q.  Sure.
7    A.  Because it means he knew his job, and I
8  have to --
9    Q.  Hire and train somebody else?
10   A.  Exactly.
11   Q.  But I imagine you were happy if he got a
12 better job?
13   A.  Yes.
14   Q.  All right.  Now, I want to talk to you a
15 little bit more about your trip to the tie plant in
16 1980.  You said that if -- that Dave Malter was
17 putting a system in place to use for anyone who
18 went in the cylinders to do any cleaning, right?
19   A.  Yes.
20   Q.  And what was that system?
21   A.  I couldn't tell you the details of it, but
22 primarily to prevent exposure and provide
23 respirators and provide gloves and provide MSDS
24 sheets and provide clothing.

Page 35

1    Q.  Now, when Dennis Davis told you that MSDS
2  sheets weren't available at the tie plant, did you
3  agree or disagree with that?
4    A.  Neither.
5    Q.  Okay.  When did MSDS sheets become used on
6  the railroad?
7    A.  I couldn't tell you the exact date, but it
8  was Dave that started the MSDS program.
9    Q.  And why did Dave start the MSDS program?
10   A.  Legal requirements.
11   Q.  And when did the legal requirements come
12 into play?
13   A.  I couldn't tell you the date.
14   Q.  Was it approximately the 1980s sometime?
15   A.  I couldn't tell you the date.
16   Q.  All right.  Fair enough.  Now, one of the
17 things that Dave did was to get MSDS sheets in from
18 companies and review them, correct?
19   A.  Right.
20   Q.  And then once he reviewed the MSDS sheets,
21 he would make sure that they were sufficient for
22 the railroad's needs.  And if they weren't, he
23 would write the companies and tell them I need more
24 information?

Page 36

1    A.  Yes.
2    Q.  And he was in charge of that program?
3    A.  Right.
4    Q.  And you were his boss?
5    A.  Right.
6    Q.  And you knew that he was doing that
7  program?
8    A.  Yes.
9    Q.  As a matter of fact, you told him to do
10 it, right?
11   A.  It was a joint effort.
12   Q.  Okay.  But it was a situation where there
13 was legal requirements that were necessary, and
14 it's one of those things that, as an industrial
15 hygienist, he was qualified to do the work?
16   A.  Yes.
17   Q.  And you thought he was qualified to do the
18 work?
19   A.  Yes, I did.
20   Q.  And in fact, do you know how many MSDS
21 sheets he might have reviewed?
22   A.  Quite a few.
23   Q.  Hundreds, right?
24   A.  Right.  I think -- I believe he was

Page 37

1  working on computerizing the program, too, among
2  other things.
3    Q.  Right.  And they had something called the
4  Univac system back in the early days, didn't they?
5  Do you remember the Univac system?
6    A.  That archaic thing, yes.
7    Q.  That archaic thing, but it was a computer?
8    A.  Yes.
9    Q.  And it was a way for the employees to get
10 MSDS sheets off of a computer, right?
11   A.  Yes.
12   Q.  And they put a terminal at certain points
13 where someone could access the terminal, right?
14   A.  I couldn't tell you the details, but in
15 essence, yes, that was the general idea.
16   Q.  And so the general idea was that the
17 railroad wanted to make sure that they complied
18 with the law, right?
19   A.  I couldn't speak for the railroad.  I
20 could speak for my department.
21   Q.  Fair enough.  Your department, which was
22 which department?
23   A.  The medical department and industrial
24 hygiene.

10  (Pages 34 to 37)

Page 38

1    Q.  So the medical and industrial hygiene
2  department wanted to make sure they complied with
3  legal requirements, true?
4    A.  Yes.
5    Q.  And in fact, you charged Mr. Malter with
6  the task of making sure that the MSDS sheets that
7  came in were legally sufficient, correct?
8    A.  Yes.
9    Q.  And he and his team reviewed hundreds, if
10  not thousands, of MSDS sheets?
11    A.  Yes.
12    Q.  And sent letters back to the manufacturers
13  indicating that, in some cases, they were
14  deficient?
15    A.  Yes.
16    Q.  Did you ever see any of the letters that
17  were sent back?
18    A.  I'm sure I have, but I couldn't tell you
19  in particular.
20    Q.  Fair enough.
21      And so Mr. Malter was also charged with
22  putting in place a system where the railroad
23  employees could, in fact, access the MSDS sheets;
24  is that fair?

Page 39

1    A.  That was the general idea, yes.
2    Q.  All right.  So if Dennis Davis says that
3  he didn't get MSDS sheets, does that sound like --
4  does that sound right to you?
5    A.  It can.
6    Q.  Why?
7    A.  Well, because it depends.  David Malter
8  was a single person, and he couldn't police the
9  availability of everything everywhere at all times.
10  I have no reason to either believe nor doubt
11  Mr. Davis when he said he couldn't get the MSDS.  I
12  didn't question him further to ask whether he saw
13  it or didn't see it or didn't understand the lingo
14  or whatever.
15    Q.  But you, as the medical director and in
16  charge of the industrial hygiene department, knew
17  that you were working hard and Mr. Malter was
18  working hard to make sure that MSDS sheets were
19  available to employees pursuant to federal
20  regulations, true?
21    A.  Yes.
22    Q.  And in fact, you thought that they were;
23  isn't that true?
24    A.  Yes.

Page 40

1    Q.  And do you have any reason to think that
2  they weren't?
3    A.  Well, I have neither reason to think that
4  they were or weren't in a specific area.  I can
5  tell you our expectation on a global area.
6    Q.  Tell me what your expectations were on a
7  global area.
8    A.  Our expectations were that the MSDS sheets
9  be there.  It's a program that we worked very hard
10  about, and that management would make them
11  available to the employees.  If some area of
12  management did not show it and it came to our
13  attention or if an employee called us up, we would
14  make sure to follow up on it and to make sure that
15  they're available.
16    Q.  Did you have any discussions with the
17  employees of the Somerville tie plant in the safety
18  meeting when you went there sometime after 1980
19  regarding MSDS sheets?
20    A.  I already told you I don't have any
21  recollection of the discussions there.
22    Q.  Moving back to 1980 and the trip that you
23  made down there --
24    A.  Yes.

Page 41

1    Q.  -- you said Dave Malter had a system in
2  place to use during the cleaning of the cylinders,
3  true?
4    A.  Yes.
5    Q.  Now, you also said that they tied somebody
6  up with a rope, and if they passed out, they would
7  pull them out?
8    A.  Yes.
9    Q.  Who told you that?
10    A.  David did.
11    Q.  Did you ever see that?
12    A.  No.
13    Q.  Did you ever talk to any other railroad
14  employees about that?
15    A.  No.
16    Q.  And you're saying that Dave Malter said --
17  how many times did that happen?
18    A.  No further comment on the fact that it was
19  a curious way of dealing with the issue.
20    Q.  Did Mr. Malter ever indicate to you that,
21  in fact, someone had to be pulled from the
22  cylinders because they had passed out?
23    A.  I did not follow up on the discussion
24  other than what he told me.  We were in a general

Page 42

1  discussion about it, and I left it at that.
2      Q.   Wouldn't that be something that would --
3  as you indicated to me, that's a curious way to
4  handle things.  Wouldn't you agree?
5      A.   Yes.
6      Q.   And wouldn't that be something that you
7  would want to follow up on in a little bit greater
8  detail?
9      A.   Yes, we did.  We developed the program.
10     Q.   Okay.  And so your understanding of -- you
11 don't have any understanding of what the program
12 was?
13     A.   You know, as I explained to you in
14 generalities, but I don't -- right now I haven't
15 looked at the write-ups.
16     Q.   Well, now, do you understand that there
17 was a little tram that they built with some kind of
18 an oxygen or air system on it that you put a hood
19 on when you went into the system?
20     A.   That makes sense.
21     Q.   And that they had Tyvek clothing?
22     A.   Yes.
23     Q.   And that they had rubber boots and Tyvek
24 gloves and things like that for cleaning out the

Page 43

1  cylinders?
2      A.   Yes, that makes sense.
3      Q.   And so are you aware of any industrial
4  hygiene assessments that were done to determine
5  what the exposure level would have been for someone
6  going into the cylinders at the Somerville tie
7  plant?
8      A.   I don't recall at this time.
9      Q.   Do you recall whether NIOSH ever did any
10 tests on that?
11     A.   You asked me that, and again, I'll give
12 you the same answer.  I don't recall.
13     Q.   Now, if you were going to try to determine
14 what an employee's exposure was at the Somerville
15 tie plant, wouldn't the best evidence that you
16 could possibly have be the industrial hygiene
17 assessments that were actually done?
18     A.   Repeat the question that you asked me.
19     Q.   Sure.  If you were going to do --
20     A.   Yes.
21     Q.   If you were going to determine what the
22 exposure was, in other words, what the dose was --
23     A.   Dose of what?
24     Q.   Of any substance that anyone might be

Page 44

1  exposed to at the Somerville tie plant.
2      A.   Yes.
3      Q.   Wouldn't the best evidence of what the
4  dose is be an industrial hygiene assessment that's
5  actually done on employees who worked at the tie
6  plant?
7      A.   Yes, could be in industrial hygiene
8  measurements.
9      Q.   But in this particular case, Dennis Davis,
10 who did actually work at the tie plant, true?
11     A.   Yes.
12     Q.   You haven't looked at any industrial
13 hygiene assessments to prepare your report in this
14 case?
15     A.   No.
16     Q.   And it's your testimony that you've never
17 seen any industrial hygiene assessments of the
18 Somerville tie plant?
19     A.   No, that's not my testimony.  My testimony
20 is that I have no recollection.
21     Q.   You have no recollection of it?
22     A.   That's correct.
23     Q.   All right.
24     A.   I have not been shown any since I've been

Page 45

1  involved in the case here.
2      Q.   You've not been shown any since you got
3  involved in the case.  Okay.
4      A.   Are these your files or mine?
5      Q.   These are actually -- just to -- we'll go
6  through them one at a time, but these are files
7  that were your files that were kept in your
8  department that you, in fact, have seen before.
9      A.   Okay.
10     Q.   And you've been CC:'d on these documents.
11     A.   Okay.
12     Q.   But we're going to go over them.  You
13 don't have to take my word for it.  We'll go over
14 it, fair enough?
15         Let me show you a document that I'm
16 marking as Exhibit No. 6 to your deposition.  This
17 is a document that has been turned over to the
18 plaintiffs, and the plaintiffs are aware of its
19 existence, all right?
20     A.   Okay.
21     Q.   Take a look at -- do you see in the lower
22 right-hand corner, sir, there's Bates labels.  Do
23 you see those?
24     A.   Yes.

12  (Pages 42 to 45)

Page 50

1    A.  Yes.
2    Q.  Okay.  Have you ever seen this document?
3  It runs from Page 29 through Page 53.  Have you
4  ever seen it before?
5    A.  I couldn't answer that question whether I
6  have seen it or not.  I can answer by saying that
7  now I don't recollect whether I saw it or not.
8    Q.  Okay.  But it's true that it exists,
9  doesn't it?
10    A.  Yes.
11    Q.  And it's true that if you take a look at
12  the report, there is contained in the report actual
13  sampling for employees who worked at the tie plant,
14  true?
15    A.  I would have to take your word for it.
16    Q.  Don't take my word on it.  Take a look at
17  Page 46.  Do those look like sampling results to
18  you, sir?
19    A.  Yes.
20    Q.  All right.  And so if I was -- if you were
21  going to do a dose calculation for someone like
22  Mr. Davis, the best thing to do, wouldn't it be to
23  just go ahead and take a look at the actual testing
24  that was done at the Somerville tie plant?

Page 51

1    A.  Come again.
2    Q.  If you were going to figure out what the
3  dose calculation was for Mr. Davis when he worked
4  at the Somerville tie plant, isn't the best
5  evidence you have to calculate dose actual testing
6  done on employees at the Somerville tie plant?
7    A.  For what?
8    Q.  For exposure to anything.
9    A.  For any substance?
10    Q.  Well, let me ask you this:  What do you
11  claim -- hold on.  Go ahead.  No, you go ahead.
12    A.  Let's start over.  You ask your question.
13    Q.  All right.  What do you claim Mr. Davis
14  was exposed to?
15    A.  He was exposed to creosote.  He was
16  exposed to dioxin.  He was exposed to PAHs.  He was
17  exposed to other potential chemicals, arsenic
18  included.
19    Q.  So of the chemicals you listed, wouldn't
20  the best evidence of dose be for an employee who
21  worked at the plant actual industrial hygiene
22  assessments of actual employees?
23    A.  No.
24    Q.  Why not?

Page 52

1    A.  Because that would only give me part of
2  the picture.  That would tell me how much PAH is
3  being diluted from the creosote while he's working.
4    Q.  Have you looked at these studies?
5    A.  I'm sure I have in the past, but I have no
6  recollection now.
7    Q.  So do you -- as we're sitting here today,
8  you don't actually know what these studies show or
9  what they're actually testing for, right?
10    A.  I think it says PAHs.
11    Q.  Okay.  Are you aware of any other studies
12  that were done at the Somerville tie plant other
13  than this study done in 1979?
14    A.  Again, I have no recollection.
15    Q.  All right.  Take a look at page number 54.
16    A.  Okay.
17    Q.  All right.  This is a letter dated
18  September 24, 1980, and you were given a copy of
19  this letter, true?  It says Dr. R.K. Khuri.
20    A.  Yes.
21    Q.  All right.  And this talks about an
22  inspection that's going to take place on October 6
23  and 7, 1980, correct?
24    A.  That's correct.

Page 53

1    Q.  All right.  Now, take a look at what's
2  been marked as page number 29.
3    A.  Going back?
4    Q.  Well, actually what I want to make sure
5  we're clear on is that if you look at Page 29, that
6  was an inspection done at the plant on October 6
7  and 7, 1980; is that correct?
8    A.  You're talking about the title of the
9  paper?
10    Q.  Right.  Well, on the right-hand side of
11  Page 29, the study was actually done on October 6
12  and 7, 1980, correct?
13    A.  Yes.
14    Q.  And the document that we just looked at
15  indicates that you received a note from Mr. Autrey
16  informing you that that inspection was actually
17  going to take place, correct?
18    A.  That's the note of September '80?
19    Q.  Right.  It's page number 54?
20    A.  Yes.
21    Q.  And so on September 24, 1980, you were
22  informed by Mr. Autrey that an inspection would
23  take place at the Somerville tie plant on October 6
24  and 7, 1980, correct?

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS  (312) 263-0052

Page 54

1    A.  Yes.
2    Q.  And, in fact, it did take place, correct?
3    A.  Seems so, yes.
4    Q.  But you have no independent recollection
5  of that occurring?
6    A.  That's correct.
7    Q.  All right.  Now, take a look at what's
8  been marked as Page 56.
9    A.  Yes.
10    Q.  Do you see that?  All right.  That's an
11  industrial hygiene report regarding the Somerville
12  tie plant that was done on October 10, 1979,
13  approximately a year before, correct?
14    A.  Yes.
15    Q.  Did you have an industrial hygienist who
16  worked for you in October of 1979?
17    A.  No.  I don't think I started working until
18  November of that year.
19    Q.  You didn't?
20    A.  No.
21    Q.  When did you go to work?
22    A.  I think '79 it was.
23    Q.  You went to work in November of '79?
24    A.  It says so in my CV.

Page 55

1    Q.  Yeah, we'll talk about that.
2        All right.  Were you aware of NIOSH going
3  to the Somerville tie plant in October 1979?
4    A.  No.
5    Q.  Now, the report date is January 16, 1980.
6  Do you see that?
7    A.  Yes.
8    Q.  All right.  So by the time that this
9  report came out, you would have been the medical
10  director for the Santa Fe, true?
11    A.  That's correct.
12    Q.  Okay.  And do you recall receiving such
13  a -- this report?
14    A.  I don't recall.
15    Q.  All right.  And you've never recalled
16  reviewing this report in your career, correct?
17    A.  Likewise.
18    Q.  Okay.  Are you aware of any other
19  industrial hygiene assessments that you -- that
20  Mr. Malter might have done at the Somerville tie
21  plant?
22    A.  Again, I don't have any recollection.
23    Q.  You don't have any recollection of any
24  industrial hygiene assessments that Mr. Malter

Page 56

1  would have done?
2    A.  Yes.
3    Q.  Okay.  Do you recall ever reviewing any
4  industrial hygiene assessments that Mr. Malter
5  might have done?
6    A.  Same answer.
7    Q.  Okay.  Have you received any industrial
8  hygiene assessments that Mr. Malter would have done
9  at the Somerville tie plant from the plaintiff's
10  attorneys in this case?
11    A.  No.
12    Q.  Would you like to see them?
13    A.  I'm sure I would.
14    Q.  Okay.  Do you think that they would help
15  you in your work in determining what the dose was
16  for employees who worked at the Somerville tie
17  plant?
18    A.  I can't answer that question.
19    Q.  Why not?
20    A.  Because I don't know what's in them.
21    Q.  Okay.  You don't recall getting them,
22  right?
23    A.  That's correct.
24    Q.  You don't recall reviewing them, correct?

Page 57

1    A.  Correct.
2    Q.  But in fact, from the documents that we've
3  reviewed in what's marked as Exhibit No. 6 to your
4  deposition, you were, in fact, CC:'d on many of
5  these documents, true?
6    A.  True.
7    Q.  Do you want to take a break?
8    A.  Please.
9    THE VIDEOGRAPHER:  We are off the record at
10  10:32 a.m.
11        (Whereupon, a short break was
12        taken.)
13    THE VIDEOGRAPHER:  We are back on the record.
14  The time is 10:59 a.m.
15  BY MR. FLOYD:
16    Q.  Dr. Khuri, before we took a break, we were
17  talking about the NIOSH studies that were done at
18  the plant in 1979 and 1980, and I think you told me
19  that you hadn't had an opportunity, or you didn't
20  recall ever seeing those studies before?
21    A.  That's correct.
22    Q.  And I think we've gone over them, and even
23  though your name is on many of the documents
24  relating to them, you didn't recall seeing them,

Page 78

BY MR. FLOYD:
1    Q.    All right.  Now, besides what the
2 attorneys told you and what the Faust and the Davis
3 family told you, have you done any other research
4 in regard to the number of cancer cases in the city
5 of Somerville?
6    A.    Before or after I finished the report?
7    Q.    At any time.
8    A.    Well, there was an interesting article in
9 the Texas Observer from 1980, which is a journal.
10    Q.    Tell me about it.
11    A.    Well, it discusses the tie plant and
12 discusses -- it's an investigative report that
13 talks about increased cancer in the area.
14    Q.    Did you bring a copy of that with you
15 today?
16    A.    No.
17    Q.    Why not?
18    A.    Because I didn't think it was part of my
19 report.
20    Q.    Where did you get that deal?
21    A.    Off the internet.
22    Q.    That wasn't provided to you by the
23 plaintiff's attorneys in this case?

Page 79

1    A.    No.  It was provided to me by
2 Mr. Holloway.
3    Q.    He's one of the attorneys in this case,
4 isn't he?
5    A.    Yes.
6    Q.    When you say that's a journal, is that a
7 scientific journal?  Is that a peer-reviewed
8 scientific journal?
9    A.    No.
10    Q.    What is it?
11    A.    It's called the Texas Observer.  It's like
12 a newspaper, but there was an article.  If you
13 haven't read it, you should read it.
14    Q.    Objection.  Nonresponsive.
15        What was the substance of the article?
16    A.    The substance was that there were -- he
17 interviewed some people and developed some
18 information that there is increased incidence of
19 cancer in the area.
20    Q.    Do you consider that scientific
21 information?
22    A.    No.
23    Q.    Do you consider the studies done by the
24 Texas Department of Health to be scientific

Page 80

1 information?
2    A.    To a degree.
3    Q.    What degree?
4    A.    The degree in having not poured over them
5 or reviewed them, I would want to know the details
6 of the study, the sampling processes, how many
7 samples they have taken, what was behind these
8 studies.  None of them address the issue of cancer.
9 They address the issue of providing numbers for
10 exposures to chemicals.
11    Q.    No, sir.  That's not what those studies
12 did.  Those studies were studies to determine what
13 the incident rates were for cancer in the city of
14 Somerville.  Those weren't --
15    A.    NIOSH study.
16    Q.    No, sir, they weren't a NIOSH study.  They
17 were Texas Department of Health.  Perhaps, you
18 should get on the Texas Department of Health
19 website and take a look at it.
20    A.    Okay.
21    Q.    But it's fair to say you haven't looked at
22 those, true?
23    A.    That's correct.
24    Q.    Let's go -- before we got off on this

Page 81

1 other tangent, I want to talk you again about your
2 trip in 1980 to the tie plant with Dave Malter.
3 You say you saw a well with greenish material
4 around it.
5        Where did you see that well?  Where was it
6 physical located?
7    A.    On the compound.
8    Q.    Okay.  It's a 350-acre compound, sir.
9    A.    I couldn't tell you exactly, but it was
10 pretty close to where the cylinders were because
11 that's the area that we saw primarily.
12    COURT REPORTER:  I'm sorry.  I didn't hear you.
13    MR. FLOYD:  That was the area that they saw
14 primarily.
15 BY MR. FLOYD:
16    Q.    Isn't that what you said?  That was the
17 area you saw primarily?
18    A.    Yes.
19    Q.    Now, specifically what I want to talk to
20 you about is you know where the cylinders were
21 located, correct?
22    A.    In the ground.
23    Q.    Right.  So as you're facing --
24    A.    The cylinders or the --

21 (Pages 78 to 81)

Page 82

1    Q.  No, the cylinders.
2    A.  Above the ground.
3    Q.  What I'm trying to figure out is where
4  this alleged well was in relation to the cylinders.
5  So as you're facing the cylinders, was it to the
6  right or to the left of the cylinders?
7    A.  What is the reasoning behind all this
8  questioning because what I will give you is
9  memories.  I know for a fact that I saw the well,
10  and it was probably to the right.
11    Q.  Okay.  Was that the -- what they called
12  the experimental cylinder, or was that a different
13  cylinder that was kind of off away from the normal
14  treatment cylinders?
15    A.  You're talking about the arsenic cylinder?
16    Q.  Yes.
17    A.  It's some type of cylinder.  It was
18  something in the ground, a well.
19    Q.  You know where the arsenic cylinder was,
20  right?
21    A.  Yes.
22    Q.  Okay.  So the arsenic cylinder was to the
23  right of the regular creosote cylinders, right?
24    A.  If memory serves me correctly, yes.

Page 83

1    Q.  Okay.  Great.  And so now what I'm trying
2  to find out from you is where the well was in
3  relation to the arsenic cylinder.
4    A.  You're confusing me.
5    Q.  Well, you said that --
6    A.  Are you talking about wells where the
7  affluent was stored or the --
8    Q.  You told me that you saw a well with
9  greenish material around it?
10    A.  Yes.
11    Q.  Okay.
12    A.  That was the arsenic well.
13    Q.  What do you mean the arsenic well?
14    A.  That was something in the ground that they
15  said had arsenic in it that had greenish material
16  around it.
17    Q.  You're saying that there was a well at the
18  Somerville tie plant with arsenic in it?
19    A.  That's what they said, yes, sir.
20    Q.  Who's they?
21    A.  Whoever was there from management when I
22  asked them what is this greenish material.
23    Q.  Tell me what else they said about that.
24    A.  I already mentioned.  I said that that's

Page 84

1  being taken care of because they're not going to be
2  using it, and I can't recall whether they said
3  they're going to remove it or cap it or whatever.
4    Q.  Now, where was that well in relation to --
5  again, I'm trying to figure out where that well was
6  in relation to the arsenic cylinder.
7    A.  That is the arsenic cylinder.  You're
8  talking about the well and arsenic cylinder, and
9  I'm talking about a capped thing with greenish
10  material around it that would have contained the
11  arsenic underground.  That is the well.  It
12  wasn't -- the well that I saw was not a cylinder
13  above ground.
14    Q.  Are you talking about a pond that had a
15  cap on it?
16    A.  Not a pond.
17    Q.  Okay.
18    A.  All there was, if memory serves me
19  correctly, it was like a little open air cover, and
20  the cylinder was in front of it.  I don't know
21  whether it's east or west.  And if you are standing
22  facing the little covered area with the greenish
23  material with the cover on top of it and looking at
24  it, then the cylinders for pressurizing the wood

Page 85

1  would have been to the left and behind you.
2    Q.  Okay.  So the well that you're talking
3  about would have been very close to the creosote --
4  I'm sorry, the arsenic treatment cylinder?
5    A.  It would have been close, yes.
6    Q.  Right.  And so because the arsenic
7  treating cylinders are to the right and a little
8  bit to the north of the creosote-treating
9  cylinders, right?
10    A.  If that's the direction.  I don't recall
11  the direction of north, south.
12    Q.  Let me just tell you that the cylinders
13  themselves, they're usually situated north-south is
14  what they are?
15    A.  I see.
16    Q.  You know, the front end is in the south
17  where they open up, and then the tracks go into
18  them, and so that would be the south end of the
19  cylinders?
20    A.  If that is important to you, I would be
21  happy to draw you a diagram of my recollection of
22  it.
23    Q.  Okay.
24    MR. HOLLOWAY:  Are you an artist?

22  (Pages 82 to 85)

Page 86

1   THE WITNESS: What's the date today? 17th?
2   BY MR. FLOYD:
3   Q.  11/19, sir.  I think it's 11/19.  You've
4   got 7/19.
5       Now, you also mentioned -- before you get
6   started on your map, you also mentioned two lakes?
7   A.  Yes.
8   Q.  So I'd like you to put the lakes on it,
9   too, if you could.
10  A.  I can't recall whether there were two or
11  three cylinders.  This would have been the
12  cylinders.  And whether the cylinders were this way
13  or that way, I can't tell you.  This would have
14  been the covered stuff here, and the well would
15  have been here.  You can call it a well or an
16  underground cylinder.  It would have been green.
17  Q.  There was like a building there, too?
18  A.  There is a little shack.
19  Q.  Okay.  All right.  And so the well that
20  you're talking about is kind of on the -- if north
21  is at the top of the paper, it's on the northwest
22  corner of that shaft?
23  A.  I couldn't tell you the direction.
24  Q.  Fair enough.

Page 87

1   A.  Whether the cylinders go this way or that
2   way, you say they go north-south?
3   Q.  Yes, sir.
4   A.  And the wells would have been -- we went
5   out somewhere else to look at the two wells.
6   Q.  Leaving the two lakes?
7   A.  The ponds.
8   Q.  Okay.  Ponds.
9   A.  I couldn't tell you how far was the
10  distance from it.
11  THE VIDEOGRAPHER:  Could you hold that up for a
12  second.
13  BY MR. FLOYD:
14  Q.  Let's go ahead and hold that up.
15      Okay.  So the ponds that we're talking
16  about are there at the top of the paper, correct?
17  A.  Probably.
18  Q.  Okay.  And I know this isn't to scale, and
19  I know this is just a general drawing.
20      Now, the cylinders that we're talking
21  about, are those the creosote cylinders, or were
22  those the arsenic cylinders that you're talking
23  about?
24  A.  No.  These were the pressure cylinders.

Page 88

1   Q.  Right.  For creosote or for arsenic
2   because they had separate cylinders.
3   A.  Creosote, yes.  Creosote.
4   Q.  Okay.  Fair enough.  All right.  So I'm
5   going to mark your map as Exhibit No. 8.
6       Now, when you were out there in 1980, what
7   was your understanding of what environmental
8   clean-up was going on out there at that time, if
9   any?
10  A.  The only understanding I had was that this
11  something is that the environmental people are
12  taking care of.
13  Q.  The environmental people were taking care
14  of it?
15  A.  Yes.
16  Q.  Okay.  Now, the ponds that were out there,
17  how -- or the lakes that you talked about, you say
18  that there were lakes with chemical affluent that
19  the environmental -- you say that there were lakes
20  out there with chemical affluent that the
21  environmental group was concerned about?
22  A.  Yes.
23  Q.  What environmental group?
24  A.  The environmental group for the railroad.

Page 89

1   Q.  Okay.  All right.  Had they indicated to
2   you whether or not the EPA had been out to take a
3   look at those ponds at all?
4   A.  I don't recall it.
5   Q.  What's your understanding of where the
6   affluent from the tie-treating facility was going,
7   if you know?
8   A.  My assumption is that it was going into
9   these wells.
10  Q.  It was going into where?  The wells?
11  A.  Not wells, the ponds.
12  Q.  Okay.
13  A.  But you know, I did not pursue the matter
14  further.
15  Q.  All right.  And you didn't pursue the
16  matter further because that's really kind of an
17  environmental concern?
18  A.  Yes, sir.
19  Q.  Well, now, you being the medical doctor
20  and all, would environmental concerns not be your
21  area?
22  A.  Say that question again.
23  Q.  Sure.  You're a medical doctor, correct?
24  A.  Yes.

Page 90

1    Q.  And you understand -- a little bit earlier
you told me that people in the environmental
3    department don't understand how potential exposure
reacts with people --
5    A.  Yes.
6    Q.  -- because they're not medical doctors,
right?
8    A.  Yes.
9    Q.  So would you have been concerned about the
affluent in the ponds as it relates to people's
11   exposures?
12   A.  If I knew that they were toxic, yes.
13   Q.  Okay.  What's your understanding of
whether or not those ponds were toxic?
15   A.  I didn't look into it, and I don't know
what was in them at that time.
17   Q.  Fair enough.  How far away from the
treating facilities were those ponds located?
19   A.  Again, I do not recall.
20   Q.  Okay.
21   A.  But they were a little bit away from it.
22   Q.  So would they have been in proximity to
people who were actually working in the cylinder
24   area?

Page 91

1    A.  I don't think so, no.
2    Q.  I mean, they were further away by --
3    A.  Yes.
4    Q.  -- several hundred yards, perhaps?
5    A.  I can't tell you, but if I remember
correctly, we drove to them.
7    Q.  Okay.
8    A.  More than 100 yards.
9    Q.  Okay.  All right.
10   A.  In the heat of Somerville.
11   Q.  Okay.  When did you go out there?
12   A.  I don't remember.
13   Q.  But it was hot?
14   A.  Probably.  I can't remember.
15   Q.  Okay.  How much time did you spend there?
16   A.  Half a day.
17   Q.  About a half a day with Mr. Malter?
18   A.  I think so.
19   Q.  Okay.  So you went to the cylinder area.
You talked with Dave Malter?
21   A.  Yes.
22   Q.  He explained to you the system that he was
going to have in place for the workers who go into
24   the cylinders, correct?

Page 92

1    A.  That's correct.
2    Q.  You were taken to the area where the
arsenic cylinder was located?
4    A.  It was right there.  I wasn't taken.  Yes.
5    Q.  And then you were shown the area where
there was an arsenic contamination; is that fair?
7    A.  As a matter of fact, it was I who raised
the issue on the arsenic, nobody raised it to me,
when I asked what is this.
10   Q.  And you were told?
11   A.  And I was told, and the rest of the
conversation is what I related to you.
13   Q.  Okay.  And so you were told that that's
arsenic.  We're no longer using it, and we're going
15   to clean that up?
16   A.  Yes.
17   Q.  Is that the gist of it?
18   A.  Yes.
19   Q.  Did I get that right?
20   A.  Yes.
21   Q.  Okay.  And then you were taken to the --
what was the reason that you were taken to the two
23   lakes?
24   A.  I think maybe David wanted me to see it,

Page 93

1    but this is an assumption.  It was an area and a
part of showing me things.  He's seen them.
3    Q.  Okay.  What was your -- do you remember
the gist of the conversation you had with Dave
5    regarding those lakes at all?
6    A.  My reaction to them?
7    Q.  No.  No.  The gist of your conversation
with Dave Malter regarding the lakes.
9    A.  Something like yuck, number one.
10   Q.  All right.  Was that you or Dave saying
yuck?
12   A.  Me saying yuck and something to the effect
that this is an area for the environmental people.
14   Q.  All right.  Do you recall any -- going to
any other area of the plant at all?
16   A.  No.
17   Q.  Do you recall -- at that 1980 meeting out
there with Dave Malter, do you recall whether or
19   not you met with any of the employees at all?
20   A.  You know, met with, I don't recall if I
met with them officially or not, but I always
22   talked to people when I know it is in my nature.  I
may have talked to them about other issue of injury
24   because that was an area of great interest.  And I

24  (Pages 90 to 93)

Page 94

1  know we met with the superintendent, and I know
2  that some people had lunch, but I don't remember
3  the gist of the conversation at lunch, nor what was
4  eaten.
5      Q.  All right.  I think we've already been
6  over that you don't recall what was eaten at lunch,
7  but -- so you think you might have talked with
8  other people, but you just can't remember the
9  substance of the conversation?
10     A.  That is correct.
11     Q.  And you think you might have -- you met
12  with the superintendent, but you don't recall the
13  gist of that conversation?  And let me break that
14  down, and make sure that we're understanding each
15  other.
16         You met with management when you went out,
17  true?
18     A.  Yes.
19     Q.  But you don't recall any conversations you
20  had with management, fair?
21     A.  No.  Anything would be surmise on my part
22  as to what would have been discussed.
23     Q.  Okay.  And then you met with rank-in-file
24  employees, somebody who wasn't management, correct?

Page 95

1      A.  I may have, yes.
2      Q.  Okay.  But you don't recall whether or not
3  you did?
4      A.  That's correct.
5      Q.  Although, you probably talked with the
6  folks?
7      A.  Yes.
8      Q.  But you don't recall the substance of any
9  conversations?
10     A.  No, sir.
11     Q.  And you more than likely -- and you think
12  you might have gone in while they were eating lunch
13  and maybe had a chat with them then?
14     A.  With management.
15     Q.  Oh, management.  You had lunch with
16  management?
17     A.  Yes.  They paid for it.
18     Q.  All right.  Fair enough.
19     A.  Are you going to pay for lunch today?
20     Q.  No, I'm not, sir.
21     A.  Then you're not management.
22     Q.  Objection.  Nonresponsive, but pretty
23  funny.
24     A.  Thank you.

Page 96

1      Q.  All right, sir.  I'm going to mark as
2  Exhibit No. 9 to your deposition a document and ask
3  if you can tell me what Exhibit No. 9 is.
4      A.  It says medical records reviewed, Dennis
5  Ray Davis.
6      Q.  Now, I noticed in looking through your
7  medical records -- we've got them over there
8  stacked next to you -- a lot of times you'll put
9  little notes and flits and things like that,
10  correct?
11     A.  Yes.
12     Q.  Do you have any handwritten notes from
13  your review of the medical records?
14     A.  I couldn't tell you.
15     Q.  Because the last time I took your
16  deposition, you had a lot of handwritten notes from
17  the review of medical records, and I thought that
18  was kind of what you normally did?
19     A.  Sometimes I do.  Sometimes I don't.
20     Q.  Sometimes you'll just flit it and then
21  dictate it?
22     A.  I read it thoroughly, not flit it, sir.
23     Q.  No, I don't mean that.  You might
24  highlight an important section or you might put a

Page 97

1  flit on an important section that you might want to
2  dictate into the record a little bit later?
3      A.  The way I do the reviews typically with
4  these cases is as I'm reviewing them, I dictate
5  them.
6      Q.  I see.  You don't usually make notes?
7      A.  No, because it takes too long to do it on
8  the computer myself.
9      Q.  Okay.  So usually when you review the
10  medical, you will dictate the information for the
11  secretaries to type up?
12     A.  That's correct.
13     Q.  Okay.  And what we have marked as Exhibit
14  No. 9 to your deposition is the dictation from your
15  review of the medical records; is that fair?
16     A.  I would think so, yes.
17     Q.  You would think so or you know so?
18     A.  Yes.  Yes.
19     Q.  Okay.  So Exhibit No. 9 is your dictation
20  from the medical record review; is that fair?
21     A.  Yes.
22     Q.  Do you have any other notes, any other
23  type of information regarding medical record
24  reviews that you've done in this particular case?

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052